**EDEN ELECTRICAL, LTD.,
et al.   Plaintiff**

v.

**AMANA COMPANY, L.P., d/b/a Amana
Appliances, Inc. and Richard
Montross Defendants**

No. C00–80.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

April 21, 2003.

Kevin H. Collins, Diane Kutzko, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiff.

Eric W. Lam, J. Michael Weston, Randall D. Armentrout, Brenda K. Wallrichs, Moyer & Bergman, PLC, Cedar Rapids, IA, Margaret C. Callahan, Mark E. Weinhardt, Belin Lamson McCormick Zumbach Flynn, Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

### I. Background

The above styled matter came on for trial before the Court and a jury in January 2003. On January 31, 2003, the jury returned the following verdicts:

(1) On the Plaintiff Eden Electrical's fraudulent misrepresentation claim against the Defendant Amana, did the Plaintiff prove all eight of the propositions listed in Instruction No. 13 by a preponderance of the clear, convincing and satisfactory evidence? **YES**.

(2) On the Plaintiff Eden Electrical's fraudulent misrepresentation claim against the Defendant Richard Montross, did the Plaintiff prove all eight of the propositions listed in Instruction No. 13 by a preponderance of the clear, convincing and satisfactory evidence? **NO**.

(3) On the Plaintiff Eden Electrical's fraudulent nondisclosure claim against the Defendant Amana, did the Plaintiff prove all nine of the propositions listed in Instruction No. 14 by a preponderance of the clear, convincing and satisfactory evidence? **NO**.

(4) On the Plaintiff Eden Electrical's fraudulent nondisclosure claim against the Defendant Richard Montross, did the Plaintiff prove all nine of the propositions listed in Instruction No. 14 by a preponderance of the clear, convincing and satisfactory evidence? **NO**.

(5) What sum will fairly and justly compensate the Plaintiff Eden Electrical for the actual damages it sustained, if any, as a result of Amana and/or Richard Montross's fraudulent conduct? **$2.1 million.**

(6) On the Plaintiff Eden Electrical's punitive damages claim against Defendant Amana, did the Plaintiff prove by a preponderance of the clear, convincing and satisfactory evidence that Amana's conduct constituted a willful and wanton disregard for the rights of another, as defined in Instruction No. 25? **YES.**

(7) Was Defendant Amana's conduct directed specifically at the Plaintiff Eden Electrical? **YES.**

(8) What sum of punitive damages, if any, do you award against Amana? **$17.875 million.**

On February 3, 2003, the District Court Clerk entered three judgments in this matter: (1) per the jury's verdicts, in favor of the Plaintiff as against only Separate Defendant Amana; (2) per the jury's verdicts, in favor of Separate Defendant Richard Montross; and (3) per the Court's grants of summary judgment, in favor of Separate Defendants Steve Prusha, Leonard Mason and Bruce Boyle.

Presently before the Court is the Separate Defendant Amana's Motion to Alter or Amend Punitive Damages Judgment (Doc. # 237). The Plaintiff timely responded and Amana submitted a reply brief. After the Supreme Court of the United States released its opinion in *State Farm Mut. Auto. Ins. Co. v. Campbell,* —— U.S. ——, ——, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003), both parties filed supplemental briefs at the Court's invitation. On April 17, 2003, the Court conducted an in-court hearing on the pending motion.

As the Supreme Court has suggested, this Court has conducted a "meaningful" trial-court level review of the jury's award of punitive damages in an effort to determine whether it violates Iowa law and whether it withstands a federal constitutional inquiry. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *see also Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1048 (8th Cir.2002) ("The district court was required by the Due Process Clause to undertake an examination of the punitive damages award."). After considering the relevant case law, the record, and the written and oral arguments of the parties, the Court concludes that the jury's award of punitive damages is constitutionally excessive, and that Amana's motion must be granted in part and denied in part.

## II. Discussion

The jury found the Separate Defendant Amana liable on an Iowa state-law claim of fraudulent misrepresentation, and awarded actual and punitive damages to the Plaintiff pursuant to Iowa law. Amana now contends that the Court should eliminate, or at least reduce, the punitive damages award under two theories: (1) the award is excessive under Iowa law; and (2) the award is constitutionally excessive under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. The question of whether a punitive damages award should be reduced as excessive under state law lies with the sound discretion of this Court. *See Rustenhaven v. American Airlines, Inc.,* 320 F.3d 802, 805–06 (8th Cir.2003). The question of whether a punitive damages award should be reduced as constitutionally excessive is one of law for the Court. *See Ross,* 293 F.3d at 1048.

The Supreme Court of the United States has identified factors for this Court to consider in determining whether a punitive damages award is excessive under the

Fourteenth Amendment's Due Process Clause. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Because Iowa courts also utilize the *Gore* framework to test the excessiveness of a punitive damages award under the state law of Iowa, Amana has confined both its state and federal arguments to the *Gore* analysis. *Citing Wilson v. IBP, Inc.,* 558 N.W.2d 132 (Iowa 1996). The Court agrees that Amana's approach to the issue is appropriate. *See Asa–Brandt, Inc. v. Farmers Co–Operative Society,* No. C01–3021, 2002 WL 1714197, at *6 (N.D.Iowa May 10, 2002).

As a threshold matter, the Court notes that while compensatory damages are intended to redress the concrete loss that a plaintiff has suffered by reason of a defendant's wrongful conduct, punitive damages serve the broader functions of deterrence and retribution. *See State Farm,* —— U.S. ——, ——, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585. As the Supreme Court of Iowa has likewise noted: "Punitive damages serve as a form of punishment and to deter others from conduct which is sufficiently egregious to call for the remedy." *McClure v. Walgreen Co.,* 613 N.W.2d 225, 230 (Iowa 2000) (internal quotation omitted). Because the jury awarded compensatory damages in the instant case, the Court accepts that the Plaintiff has been made whole for its actual losses: "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to

achieve punishment and deterrence." *State Farm,* —— U.S. ——, ——, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585.[1]

Before undertaking its *Gore* analysis, Amana argues that "Eden's entire case ... portrayed Montross as the ringleader of a clandestine scheme to defraud Eden. According to Eden, Montross dispatched Adam to offer Eden an Amana distributorship, while harboring a hidden intent to cancel the contract after Eden purchased Adam's inventory." Amana contends that because the jury did not find Mr. Montross personally liable, the punitive damages award "could only be designed to punish Amana for misrepresentations made solely and entirely by Adam." Amana notes that this is a "tenuous position" because Mr. Eden testified that he did not rely on Dr. Adam's representations, and because there was no evidence submitted at trial that Amana knew of Dr. Adam's misrepresentations to the Plaintiff. Furthermore, Amana argues that it is difficult to perceive how Amana could be liable for Dr. Adam's misrepresentations in view of the integration clause of the distributorship agreement.

The Plaintiff disagrees with Amana's position that it was punished solely for the conduct of Dr. Adam: "Contrary to the suggestion of Amana, its reprehensible conduct was committed not only by Leon Adam but also by several other Amana agents, including high-ranking Amana officers." With citation to the evidence proffered at trial, the Plaintiff describes Amana's fraudulent scheme as follows:

Amana's Vice President of International Sales Richard Montross instructed

---

1. In oral arguments, the Plaintiff argued that the Court need not presume that a plaintiff has been "made whole" by the compensatory damages award when considering whether a punitive damages award is constitutionally excessive. *Citing State Farm,* —— U.S., ——, ——, 123 S.Ct. 1513, 1524–25, 155 L.Ed.2d

585 ("[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."). The Court disagrees with this argument in view of other quoted language from the *State Farm* opinion.

Leon Adam to find a "sucker" upon whom Amana could unload uncertain outdated inventory.... Adam chosen Eden Electrical. Amana representatives (including Leon Adam, Manager of International Credit Leonard Mason, and Territory Sales Manager Steve Prusha) promised Eden Electrical an exclusive, long-term distributorship with a direct business / credit relationship, in exchange for the purchase of certain inventory for $2.4 million. Eden Electrical was appointed as Amana's distributor on February 16, 1998.

In April 1998, Vice President Richard Montross and Leon Adam discussed the effect of terminating Eden Electrical pursuant to their fraudulent plan. Montross' handwritten notes of their conversation on April 28th reflect the following advice from Adam: "Israeli courts [sic] only remedy against foreign manufacturers is to allow some time to transition." (Exhibit 163). On that same day, Adam sent a document entitled "Confidential Remarks" to Montross. (Exhibit 164). This document, produced from Amana's files, also discusses the legal effects of Amana's fraudulent scheme:

> STRATEGY: please disregard the previous 3–pages TRIDENT's termination letter—as it was generated before Eden's April 27 letter to Amana. INSTEAD, a different approach which looks more liberal and fair should be taken....
>
> 3. This Strategy will probably cause Eden (if at all) to sue in Israel (TRIDENT or the NEW DISTRIBUTOR), as they cannot sue Amana in Israel. See paragraphs M + N (arbitration—Iowa, jurisdiction—Iowa)....

> LEGAL: Israeli Law protects very strongly foreign manufacturers' rights and appointments. The only remedy / compensation given by the courts is TIME (usually providing 30 to 180 days for transition). We are not worried about any legal proceedings or resulting marketing disturbances against the NEW DISTRIBUTOR or TRIDENT itself. Any Claim against Amana placed in Israel will probably be initially dismissed.... [T]he 30–days and 5–month non exclusive was designed to show a very soft—fair approach of Amana, to block in advance any possible claims with a high probability of success.

(Exhibit 164).

On May 4, 1998 (a mere 77 days after appointing Eden), Amana terminated Eden's distributorship. Eden had not even received the inventory (which it later learned to be outdated) at the time of its termination.

Eden's termination was executed pursuant to a two-sentence letter signed by Vice President Montross. (Exhibit 28). Montross' letter afforded absolutely no explanation for the termination.[2] (Exhibit 28).

Immediately upon receipt of the termination letter, Itzhak Eden called Montross seeking an explanation. Montross secretly recorded the call (which was the first call between the two men). During that call, Montross refused to meet with Eden, saying that he did not "see the need."

Eden Electrical then faxed numerous letters to Amana seeking an explanation for its termination. Specifically, Eden Electrical sent: a May 7, 1998 letter to Goodman's President Thomas Burkett

---

**2.** The Court notes that this letter stated in pertinent part: "Dear Sir: In accordance with our agreement, we are hereby exercising our rights ... and terminating our agreement regarding distribution of Amana Appliances effective 30 days from today's date. We wish you the best in your future business endeavors."

and Amana's Senior Executive Vice President Peter Alexander (Exhibit 169); a May 10, 1998 letter to Richard Montross (faxed by Montross to General Counsel Paul Dobrowski) (Exhibit 170); a May 12, 1998 letter to Thomas Burkett and Peter Alexander (Exhibit 173); a May 12, 1998 letter to Richard Montross and Leonard Mason (Exhibit 174); and a May 18, 1998 letter to Richard Montross and Leonard Mason (Exhibit 176). In those letters, Eden Electrical explained that it had not received the inventory and that it was incurring significant damages on a daily basis.

It is undisputed that Amana's officers made no response to Eden Electrical's letters. Amana's attitude is reflected in Vice President Montross' handwritten notes on his copy of Eden's May 18th letter: "Should we answer any point?" (Exhibit 176).

Amana's attitude is also reflected in Vice President Montross' comments during his second phone call with Itzhak Eden, which Montross again secretly recorded. During that call, Montross told Eden that he (Montross) had not responded to the faxes "because we have nothing to say." (Exhibit 177). Montross also told Eden that he would not even provide written documentation that the inventory had been produced in the United States, documentation that Montross knew was necessary to remove the goods from the port and that only Amana could provide.

Only eight days after Eden's termination was effective, Amana officially appointed Crystal Consumer Products as its distributor in Israel. (Exhibit 196). Amana had promised the distributorship to Crystal prior to appointing Eden. (Exhibit[s] 72, 140). Crystal still serves as Amana's distributor.

These facts demonstrate that Amana never had any intention of having Eden Electrical serve as its distributor in Israel. . . .

As indicated above, high ranking Amana officers told numerous lies to Eden Electrical in furtherance of the fraud. The Manager of International Credit (Leonard Mason) and Territory Manager (Steve Prusha) both wrote false letters to Eden Electrical to induce the company to enter into the distributorship agreement.

Leonard Mason (Manager of International Credit) wrote a false letter to Eden Electrical on the day of the closing (February 16, 1998). While Mason's letter purported that it was given "as a clarification and to avoid misunderstandings and confusion," it contained several lies. (Exhibit 18). First, the letter stated that Amana held title to certain inventory and would transfer title to Eden Electrical. As Mason testified at trial, those statements were false. Mason's letter also stated that Eden Electrical would have a "direct business and credit relationship" with Amana. Mason admitted at trial that he had no intent to honor that promise either. While Defendant's Motion suggests that none of Mason's misrepresentations were material, that simply is not true. As several Eden Electrical representatives testified and as several documents reflect, Eden Electrical would not have entered into the distributorship agreement without Amana's promise of a direct business / credit relationship. Mason's promise of a direct business / credit relationship was indeed material. It also strains belief to argue that representations regarding the ownership and title of inventory purchased for $2.4 million were of no significance to the purchaser.[3]

3. Amana disagrees that Mr. Mason's letter contained falsehoods: "The letter does not state that Eden Electrical 'would have' a direct business and credit relationship with

Territory Sales Manager Steve Prusha also gave a false letter to Eden Electrical on the day of closing. Prusha's letter promised that Eden would serve as Amana's "exclusive distributor" in Israel. (Exhibit 47). As several witnesses testified, Eden Electrical would not have entered into the distributorship agreement without promises of exclusivity. Prusha's promise of exclusivity was a lie. Unbeknownst to Eden Electrical, when Amana was promising an exclusive distributorship to Eden, Amana already had orders from another company (Crystal) for Amana-manufactured refrigerators to be sold in Israel. Also unbeknownst to Eden Electrical, on the day that Amana signed an exclusive distributorship agreement with Eden, it signed an agreement with Leon Adam allowing him to sell Amana-manufactured refrigerators in Israel. Both Amana's agreement with Crystal and Amana's agreement with Adam were directly contrary to the terms of Eden's distributorship agreement as well as Prusha's letter.

In addition to lying to Eden Electrical, Amana's officers told lies regarding the Israeli distributorship to the court-appointed receiver in Israel. It is undisputed that both Amana's General Counsel Matthew Clark and its Territory Sales Manager Prusha wrote false letters directed to the Israeli receiver.[4] On the very day that Eden Electrical was appointed as Amana's exclusive distributor, Amana's General Counsel (Matthew Clark) wrote a letter to the court-appointed receiver in Israel. Clark's letter stated: "Amana is actively searching for an experienced distributor to replace Pan–El." (Exhibits 2, 129). There is no question but that Clark's statement to the receiver was a lie. There is also no question but that Clark's letter was part of Amana's fraudulent scheme. The letter is referenced in Leon Adam's agenda for the February 16, 1998, meeting, which was sent to Steve Prusha. (Exhibit 16). Clark's letter is also referenced in Leon Adam's "summary" of events, provided to Amana on February 22, 1998. (Exhibit 13A).

Similarly, on February 5, 1998, Territory Sales Manager Prusha wrote a letter stating: "Please be advised Amana will be seeking a replacement distributor that has had prior experience in the marketing and sale of refrigeration products." (Exhibit 11). Prusha admitted during trial that his statement regarding the distributorship was a lie.

---

Amana; the letter actually states 'Eden Electrical, Ltd. will establish a direct business and credit relationship with Amana.' Eden fails to explain this distinction. Nothing in the letter indicated the distributorship would be anything other than terminable-at-will. It should also be kept in mind that this letter was presented to Eden before the contract was signed by both parties, and thus, it was superceded by the full, integrated agreement." The Court disagrees with Amana's analysis. The record is clear that the Plaintiff was demanding a direct business and credit relationship, and Mr. Mason's letter in response could readily have been viewed by the jury as having been proffered with an intent to mislead. And though the contract contained an integration clause, the letter was presented at the same meeting where the contract was executed and could be interpreted as part of the scheme to induce the Plaintiff to enter into the distributorship agreement so that Amana could obtain the $2.4 million payment.

4. Amana contends that the fact that its agents allegedly lied to a court-appointed receiver in Israel is irrelevant, and cannot be a basis for any punitive damages award. The Court concludes that this evidence is relevant because it shows that Amana's agents had no qualms about lying, even to court-appointed officials. More importantly, these misrepresentations were related to the carrying out of the overall fraudulent scheme.

Prusha also admitted that he included the lie at the request of Leon Adam and that he understood that Adam would present the false letter to the court-appointed receiver in Israel.

Amana's officers also told a number of lies during this litigation. Amana's Former General Counsel Paul Dobrowski and Vice President of International Sales Richard Montross lied in answers to interrogatories. On behalf of Amana, Montross verified an answer to interrogatory stating that Amana had not conducted an investigation of Eden Electrical's termination prior to filing the lawsuit (May 2000). (Exhibit 215). The answers were signed and served on Plaintiff's counsel by Attorney Paul Dobrowski, who had previously served as Amana's General Counsel and was then serving as Amana's outside counsel. Contrary to the sworn answer, Dobrowski had ordered and Montross had participated in an investigation back in 1998.

Amana officers continued to tell lies during the trial. For instance, Amana's Chief Financial Officer Bruce Boyle, Vice President Richard Montross, and Territory Manager Steve Prusha all lied about the handwritten changes to Eden Electrical's contract. The facts regarding the changes are as follows. After Eden signed the distributorship agreement, Amana representatives Prusha and Mason took the agreement outside the presence of the Eden representatives where Boyle made certain handwritten changes. As a result of the handwritten changes, the notice provision was changed from 180 days to 30 days. (Exhibit 17). Boyle, Montross, and Prusha all testified at trial that the handwritten changes were made pursuant to a new company policy. There testimony was false, as revealed by the following undisputed facts: 1) Eden distributorship agreement is the only exclusive distributorship agreement in the history of Amana with a 30–day notice provision; 2) Eden's successor (Crystal) was given a 180–day notice provision (signed by the president of the company who supposedly set the policy); 3) There was no written company policy on the issue; and 4) Eden's distributorship was terminated 77 days after it began.... [5]

Amana officers also gave false testimony regarding the source of the $2.4 million. Vice President Richard Montross and Manager of International Credit Leonard Mason both testified that back in February 1998, they believed that the $2.4 million was Leon Adam's funds. Several pieces of evidence revealed that their testimony was false. First, Bruce Boyle (Amana's CFO) testified (upon questioning by the Court) that in February 1998, he knew that the funds did not come from Leon Adam. According to Boyle's testimony, he knew that the funds came from the investor (Eden Electrical). Second, Amana knew in February 1998 that if it accepted funds from Leon Adam, those funds could well be set aside as fraudulent transfers under the bankruptcy laws. (Exhibit 116). Third, the week before Amana accepted

---

**5.** Amana disagrees with the Plaintiff that the change in the notice provision from 180 days to 30 days is relevant, especially to the question of punitive damages. However, the Plaintiff is right. The representation that the change of the notice provision was pursuant to a mere company-wide change in policy, coupled with the representations that the Plaintiff could expect to have the distributorship for decades like Dr. Adam's companies, must be put in context of the overall fraudulent scheme. Amana's agents' reassuring but false explanations of the reasons for the change were intended (so the jury could have found) to mislead and to lull the Plaintiff into going forward with the sham distributorship agreement.

the $2.4 million in question, Amana sued Leon Adam's company (Williams International), accusing Adam of being a cheat, a fraud, and a thief. (Exhibit 31). If Adam were the type of businessman alleged in Amana's pleading, why would Amana go into business with Adam seven days later? Fourth, Amana confirmed with the bank that the source of the funds was Eden Electrical, not Leon Adam. (Exhibit 128).

During the trial of this case, Manager of International Credit Leonard Mason also admitted that he had lied in other litigation as well. According to Mason, when he filed an affidavit in Amana's New Jersey lawsuit against Leon Adam's company, he lied about the value of the inventory at issue.

The Court agrees that a reasonable jury could, on the basis of the evidence, have found the facts in accordance with the Plaintiff's just quoted summary. Amana's presentation of the facts on the issue of punitive damages in both its briefs and its oral argument was entirely too narrow, as explained *infra*. The alleged fraudulent scheme was that Amana harbored a desire to appoint Crystal as its new Israeli distributor, but Crystal was unwilling to liquidate Dr. Adam's $2.4 million debt by purchasing the Amana appliances held by Dr. Adam's company in New Jersey. A scheme was devised to find a "patsy" to purchase said inventory in return for a sham distributorship, which would be terminated once Amana was paid the $2.4 million. Certainly events occurring subsequent to the execution of the contract are relevant to the operation of the scheme, and could have properly been considered by the jury on the issue of reprehensibility.

The Court disagrees with Amana's argument that the jury chose to punish it solely for the conduct of Dr. Adam. First, evidence was presented that the Plaintiff heavily relied on the statements regarding exclusivity and a direct relationship made by the Amana officials on the day of the execution of the distributorship agreement at Amana's headquarters. Second, based upon the evidence presented at trial, the jury could have reasonably concluded that the alleged fraudulent scheme (originated by Dr. Adam and Mr. Montross) was orchestrated and supported by various levels of officials within the Amana management hierarchy. The fact that the jury did not find Mr. Montross personally liable to the Plaintiff,[6] and that the Court granted summary judgment to Messrs. Mason, Prusha and Boyle, does not exonerate them from being considered active participants in the fraudulent scheme, nor foreclose that Mr. Montross orchestrated the scheme. In fact, based upon the finding of liability against Amana, it is not possible to creditably argue that these individuals played no role in the fraudulent enterprise. As the Court noted in its January 30, 2003, Order, a corporation acts only through its agents, and the conduct of the individual Defendants could establish Amana's fraud. Messrs. Mason, Prusha and Boyle were dismissed from this matter because the Court concluded that a *prima facie* case of fraud could not be proven separately against any of these individuals, primarily because the Plaintiff relied upon the overall representations of Amana made through these individuals, not upon the representations of these individuals standing alone.[7] Likewise, the jury's verdicts in favor of Mr. Montross only meant that the

---

6. No one can say with certainty why the jury did not find Mr. Montross personally liable. *See infra*.

7. This is consistent with Mr. Eden's testimony that he was not relying *per se* on Dr. Adam's representations, but rather on Amana's representations made through its agents.

Plaintiff failed to prove to the jury's satisfaction the eight *prima facie* elements of fraudulent misrepresentation and the nine *prima facie* elements of fraudulent nondisclosure.[8] The Court's January 30, 2003, Order stated: "The law does not require that any one Amana agent satisfy all the *prima facie* elements of a fraudulent misrepresentation or a fraudulent nondisclosure in order for Amana to be liable; rather, any particular agent may satisfy an element, so long as all elements are in fact satisfied.... The jury may reasonably consider the conduct of Messrs. Boyle, Mason and Prusha on February 16, 1998, to satisfy one or more of the necessary *prima facie* elements. For this reason it is proper to instruct the jury as to their status and conduct as regards agency principles."

■ The Court also disagrees with Amana's contention that it cannot be liable for Dr. Adam's misrepresentations in view of the integration clause of the contract. This is a lawsuit for fraud, not breach of contract. The pre-contract fraudulent understanding between Dr. Adam, Mr. Montross and other Amana officials vitiates the effectiveness of the contract's provisions. The Plaintiff was willing to abide by the contract provisions on the explicit and implicit understanding that the contract was entered into in good faith and would be implemented on such basis. The jury found for the Plaintiff on the fraudulent misrepresentation theory, and the evidence supports such a verdict.

■ In its reply brief and its oral argument, Amana disputes the Plaintiff's reliance on Amana's agents conduct post-February 16, 1998 (i.e., the date the distributorship contract was executed). The

Court disagrees. Amana's conduct post-February 16, 1998, was clearly in furtherance of the overall fraudulent scheme. The scheme was complete only once the distributorship agreement was terminated and Crystal appointed the new distributor. In any event the conduct could have properly been considered by the jury as circumstantial evidence of the fraudulent scheme. Amana's contentions that it is being punished for unproven or superfluous conduct is wholly without merit.

■ Turning from the evidence presented at trial to the *Gore* analysis, the Court notes that the Supreme Court has held that a state court award of punitive damages may be so "grossly excessive" as to violate the Fourteenth Amendment to the federal constitution. *See Gore,* 517 U.S. at 568, 116 S.Ct. 1589 ("Only when an award can fairly be categorized as 'grossly excessive' in relation to [the state's] interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."). The *Gore* analysis is equally applicable in the instant case, where the Plaintiff proceeded against the Defendants in federal court on state law claims on the basis of diversity of citizenship subject matter jurisdiction. *See Schimizzi v. Illinois Farmers Ins. Co.,* 928 F.Supp. 760, 785 (N.D.Ind.1996).

In *Gore* the Supreme Court held that in order for an award of punitive damages to pass constitutional muster, the award must meet the following elements: (1) the punitive damages award must relate to conduct occurring within the state; (2) a defendant must receive fair notice of the conduct that will subject him to punishment; and (3) a defendant must receive fair notice of the severity of the penalty that the state may

---

**8.** In order for Amana to be held liable on the fraudulent nondisclosure claim, the jury would have had to conclude that "special circumstances existed which gave rise to a duty of disclosure between Amana and the Plaintiff." *See* Jury Instruction No. 14. The jury held Amana liable on the fraudulent misrepresentation claim. It is important to note that a "misrepresentation ... may include silence." *See* Jury Instruction No. 15.

impose. Regarding this third element, the Supreme Court has enunciated three "guideposts" for courts to consider: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and its punitive damages award; and (3) the differences between this remedy and the civil penalties authorized or imposed in comparable cases. *See Gore,* 517 U.S. at 574–75, 116 S.Ct. 1589. None of the three "guideposts" are outcome-determinative; rather, the Court is to consider them in turn upon the facts of a particular case.

Regarding the first element, the Court is satisfied that the punitive damages award relates to conduct that occurred primarily within Iowa. Here, the actions of Amana's agents in Iowa before the day of the execution of the contract,[9] on the day of the execution of the contract, and after the execution of the contract provide the bases for the Plaintiff's punitive damages award. The fraudulent scheme originated in Iowa, and any conduct by Amana's agent (Dr. Adam) outside of Iowa was clearly in furtherance of the Iowa-born scheme. It is not reasonable to assume that the jury's consideration of any out-of-state conduct was for purpose of multiplying the punitive damages award. Rather such evidence was considered as evidence of the very fraud alleged. *See State Farm,* — U.S. —, —, 123 S.Ct. 1513, 1519–21, 155 L.Ed.2d 585 ("Our concerns are heightened when the decisionmaker is presented ... with evidence that has little bearing as to the amount of punitive damages that should be awarded."). Thus, the

"out-of-state" evidence presented at trial and considered on the punitive damages issue bore a direct relation to the harm suffered by the Plaintiff, and the Plaintiff's proof of the fraudulent scheme. The Supreme Court recently dealt with the contrasting case:

> The [state] courts awarded punitive damages to punish and deter conduct that bore no relation to the [plaintiffs'] harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.

*State Farm,* — U.S. —, —, 123 S.Ct. 1513, 1522, 155 L.Ed.2d 585. This was not the circumstance of the instant case; all proffered evidence bore a relation to, or a direct nexus to, the fraud alleged and the Plaintiff's harm.

Furthermore, it appears that Iowa would have, and has, an interest in seeing that all persons (whether citizens of Iowa or not) doing business with Iowa companies be dealt with honestly and in good faith. It would be anomalous to conclude that Iowa would tolerate, accept or give the green light to the defrauding of outsiders by Iowa companies.

Amana stresses that Dr. Adam approached the Plaintiff in Israel, and that exemplary damages are not recognized under Israeli law. *Citing Almog v. Israel Travel Advisory Service, Inc.,* 298 N.J.Super. 145, 689 A.2d 158 (1997).[10] The Court

---

9. Remember, the fraudulent scheme also involved the pre-contractual desire by Amana to recover on Dr. Adam's $2.4 million debt, as well as the pre-contractual decision that it really wanted Crystal as its exclusive distributor and would cancel the Plaintiff's contract once Amana recovered the $2.4 million from the Plaintiff.

10. The Court finds of interest the following quotation from the *Almog* court: "Deterrence of egregiously wrongful conduct is also what punitive damages are all about.... Certainly the fact that [Israeli law] does not award punitive damages is not indicative of an interest in whether New Jersey law allows assessment of a punitive damages award against a New Jersey resident. *The point, of course, is*

fails to see the significance of this, in light of the above conclusion that the fraudulent scheme originated in and was orchestrated from Iowa. In any event, Amana has made no showing that fraudulent conduct is otherwise "legal" in Israel.[11] The Plaintiff notes:

> Defendant's argument regarding Israeli law is particularly troubling because it is reminiscent of the legal advice given by Leon Adam to Richard Montross.... Just as Adam encouraged Amana to terminate Eden Electrical because Eden could not seek punitive damages under Israeli law, Defendant's Motion suggests that Eden should not recover punitive damages in the present lawsuit because it could not recover such damages in its own country.

Furthermore, the Court strongly disagrees with Amana's following characterization of this case: "Iowa's interest in deterrence in this case is: to make sure Iowa companies do not 'apparently authorize' agents to misrepresent the company's intentions concerning the length of a potential distributorship agreement when communicating to third parties outside the state of Iowa." First, the jury could have determined Dr. Adam to be Amana's agent under one of three theories: (1) actual authority; (2) apparent authority; or (3) ratification. *See* Jury Instruction No. 10. There is no basis for Amana's conclusion that the jury considered Dr. Adam to be Amana's agent only under an apparent authority theory. Second, the fraudulent

misrepresentation claim was not that Amana simply lied about the length of a potential distributorship, but that Amana orchestrated a scheme to require the Plaintiff to pay Dr. Adam's $2.4 million debt in order to obtain an exclusive distributorship agreement which Amana at no time intended to honor.

As regards the second *Gore* element, Amana contends that it did not have fair notice of the conduct that subjected it to punitive damages. The Court disagrees. As discussed *supra*, Amana's argument assumes incorrectly that the punitive damages award was based entirely on the conduct of Dr. Adam.[12] However, the jury was permitted to infer (and could reasonably have done so) that Mr. Montross authorized Dr. Adam to locate a distributor to buy Dr. Adam's inventory in return for Amana granting it an exclusive distributorship. The fact that the jury did not hold Mr. Montross individually liable does not mean that it did not believe him to be culpable. The jury perhaps concluded that only Amana, not Mr. Montross, benefitted from the fraud. The jury could have found that Dr. Adam lied about Mr. Montross's personal benefits, past and present, but believed his testimony concerning the fraud alleged to benefit Amana.

Furthermore, the circumstances of the Plaintiff's appointment as distributor did not involve low-level employees. Rather, the jury was permitted consider the conduct of Amana's management hierarchy in determining whether Amana committed

---

that its citizens are not being so assessed. By the same token, we do not see how Israeli law can reasonably be regarded as offended by one of its citizens being fully vindicated in the courts of another jurisdiction." *See Almog*, 689 A.2d at 164.

**11.** The Supreme Court has noted that a "state cannot punish a defendant for conduct that may have been lawful where it occurred." *State Farm*, —— U.S. ——, ——, 123 S.Ct.

1513, 1522, 155 L.Ed.2d 585. As noted, the fraud here occurred primarily in Iowa.

**12.** The Court finds curious Amana's contention that it had no indication that Dr. Adam had "engaged in fraud" prior to May 1998. In February 1998 (prior to the date of the execution of the distributorship agreement) Amana filed suit against Dr. Adam's company, Williams International, accusing it of embarking upon a scheme to defraud Amana.

the alleged fraud against the Plaintiff. The knowledge of Messrs. Montross, Mason, Prusha and Boyle can appropriately be imputed to Amana because these individuals were at all times relevant to this lawsuit acting in a managerial capacity. *See Hampton v. Dillard Dept. Stores, Inc.,* 18 F.Supp.2d 1256, 1275 (D.Kan.1998); *Briner v. Hyslop,* 337 N.W.2d 858, 866–67 (Iowa 1983). The Supreme Court recognizes this principle, and has likewise stated: "Imposing exemplary damages on the corporation when its agent commits intentional fraud creates a strong incentive by those in a position to guard substantially against the evil to be prevented." *Haslip,* 499 U.S. at 14, 111 S.Ct. 1032 (internal quotation omitted).

In any event, it is clear that Amana ratified the fraudulent scheme of its authorized agents by initially accepting and thereafter retaining the $2.4 million paid by the Plaintiff. Even after the detailed circumstances of the fraud were brought to the attention of Amana and Goodman management by Mr. and Mrs. Eden, no action was taken to rectify the matter. It is entirely reasonable and appropriate to punish an employer for the ratification or approval of fraudulent acts of its agents.

The third element of *Gore,* determining whether a defendant received fair notice of the severity of the penalty that state law may impose, encompasses the commonly cited three guideposts a court is to consider. As noted, none of these guideposts are outcome-determinative; rather, the Court is to consider them upon the facts of the case. The Court will consider each of these three guideposts in turn.

The first, and most important, guidepost is the degree of reprehensibility of the conduct. *See Gore,* 517 U.S. at 575, 116 S.Ct. 1589. The Supreme Court has noted that a punitive damages award should reflect the enormity of its offense, and that "some wrongs are more blameworthy than others." *See id.* The Supreme Court recently noted:

We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*See State Farm,* —— U.S. ——, ——, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585.

The instant case falls within the category of one causing economic harm, rather than a physical harm. Amana's conduct appears to be an isolated incident; the record does not reveal any other instances of fraudulent conduct against a distributor. Furthermore, the record also does not reveal that the Plaintiff should be considered as a financially vulnerable party. It was, and is, a large, successful enterprise.[13]

---

**13.** The Court takes this opportunity to discuss the founder and architect of the highly successful Eden Electrical, Itzhak Eden. An Iraqi Jew, Mr. Eden and his family left Iraq when he was a small child for Israel. As a young adult in Israel, and with only a modest amount of education, he worked diligently to create his successful chain of Eden Electrical stores. The jury was very likely impressed with Mr. Eden's testimony; he came across as a man with much character and integrity, as well as a strong work ethic. Mr. Eden placed much confidence in the Amana representations, feeling he could trust the American company. It was evident that Mr. Eden was quite excited and proud of the prospect of both doing business with and associating his company name with a company from the United States. He even had the logo for his

Nevertheless, the harm caused by Amana's conduct can be viewed as being the result of "intentional malice, trickery, or deceit." And, though the Plaintiff suffered only economic damages, Amana's conduct certainly falls at the more reprehensible end of the business fraud category. *See Gore*, 517 U.S. at 579–80, 116 S.Ct. 1589 ("[T]he omission of a material fact may be less reprehensible than a deliberate false statement."). As the Court noted in its January 24, 2003, Order: "[I]f one accepts the Plaintiff's evidence, one can hardly think of a more egregious intentional and malicious business fraud case." The Supreme Court has noted: "[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... can warrant a substantial penalty." *Gore*, 517 U.S. at 576, 116 S.Ct. 1589.

The second guidepost is the disparity between the harm and the punitive damages award, i.e., the ratio between the compensatory and punitive awards. *See id.* at 575, 116 S.Ct. 1589. The issue for the Court is whether the exemplary damages bear a reasonable relationship to the compensatory award. *See id.* at 580, 116 S.Ct. 1589. The Supreme Court recently discussed this second guidepost:

> [W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pa-*

· *cific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ], in upholding a punitive damages award, we concluded that an award more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. We cited that 4–to–1 ratio again in *Gore*. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, or, in this case, 145 to 1.

Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, muse be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

*See State Farm,* —— U.S. ——, ——, 123 S.Ct. 1513, 1523–24, 155 L.Ed.2d 585 (internal quotations and citations omitted).

In the instant case, the parties stipulated that Amana's net worth at the time

new operations display an American flag. He sought opportunities to meet with representatives of Amana to develop plans and strategies

to make the distributorship successful but was rebuffed without explanation at every turn.

of its relevant conduct was approximately $325 million. The Court instructed the jury that "[i]n fixing the amount of punitive damages, you may consider all the evidence, including: . . . (2) The amount of punitive damages which will punish and discourage like conduct by Amana in view of its financial condition." *See* Jury Instruction No. 23. In *State Farm,* the Supreme Court addressed the issue of a defendant's wealth in relation to a punitive damages award. *See id.* at 1524–25. Contrary to various media accounts of the opinion, it may still be proper for the jury to consider the financial condition of a defendant. *See, e.g.,* Kathryn Kranhold, *Megadamages Against Industry May Be History,* Wall St. J., Apr. 9, 2003, at B1, B4 ("The Supreme Court ruling says a jury can't consider a defendant's wealth."). The Supreme Court actually held that the "wealth of a defendant cannot justify an *otherwise* unconstitutional punitive damages award." *See State Farm,* —— U.S. ——, ——, 123 S.Ct. 1513, 1524–25, 155 L.Ed.2d 585 (emphasis added). Thus, the fact that a defendant is a wealthy corporation does not mean that a court is free to disregard the *Gore* analysis of determining of whether an award is violative of the Fourteenth Amendment. As explained *infra,* if punitive damages are to continue to serve the broader functions of deterrence and retribution, *see id.* at 1519–20, the defendant's wealth must be a consideration in calculating any award.

In the instant case, the ratio of punitive damages to compensatory damages is approximately 8.5 to 1. Furthermore, the Plaintiff has received a substantial compensatory damages award: $2.1 million.

The third guidepost is the differences between the punitive damages award and state civil and criminal penalties imposed in similar cases. *See Gore,* 517 U.S. at 575, 583–84, 116 S.Ct. 1589. If punished criminally, Amana's fraudulent conduct

would have subjected it to a maximum term of imprisonment of ten years, and a maximum fine of $10,000. *See* Iowa Code Ann. §§ 714.8, 714.9, 902.9. These penalties reveal Iowa's public policy of treating fraudulent conduct seriously, and supports a finding of substantial punitive damages against Amana. However, these penalties shed little light on what amount of punitive damages are constitutionally permissible. As the Supreme Court noted: "The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility." *See State Farm,* —— U.S. ——, ——, 123 S.Ct. 1513, 1526, 155 L.Ed.2d 585.

In the instant case, the Court concludes that the jury's award of punitive damages in the amount of $17.875 million was rationally based upon the evidence presented, and is not so grossly excessive or based upon improper passion or prejudice as to be violative of Iowa law. The award does not shock the conscience of the Court. The Court further notes that the jury is to be commended for attentively sitting-through the three-week trial, a proceeding where much of the testimony was in the form of video-taped depositions or rendered through interpreters. It is evident to the Court that the jury was not improperly inflamed or prejudiced in favor of the Plaintiff: the jury found against the Plaintiff on three of its four claims, and did not award the Plaintiff its requested compensatory damages.

Nonetheless, the award simply cannot withstand a federal constitutional inquiry under the excessiveness guidelines announced in *Gore* and further explained and refined in *State Farm.* After considering the *Gore* factors, and the three guideposts encompassing the third factor of fair notice of the potential sanction, the Court con-

cludes that the award is constitutionally excessive under the Due Process Clause and therefore must be reduced as a matter of law.

As explained *supra*, the Court finds that the award satisfied the first two *Gore* elements: (1) it is based upon conduct that occurred primarily in Iowa, and the state has a legitimate state interest in deterring and punishing such behavior; and (2) Amana received fair notice of the conduct that subjected it to punishment. Furthermore, the third guidepost of the third *Gore* element, the differences between the punitive damages award and state civil and criminal penalties imposed in similar cases, demonstrates that Iowa considers fraudulent conduct within its borders to be a significant crime.

Rather, it is the application of the first two guideposts of the third *Gore* element, demonstrated by the Supreme Court in *Gore* and *State Farm*, that leads this Court to conclude that the Plaintiff's punitive damages award is constitutionally excessive and must be reduced in order to comport with Amana's due process guarantees. As regards the reprehensibility of Amana's conduct, the harm caused was economic and not physical. There was no reckless disregard of the health or safety of the Plaintiff. Furthermore, the Plaintiff was not a financially vulnerable entity, but rather a sophisticated and highly-successful Israeli business. Amana's conduct appears to be an isolated incident; at least the record does not reveal any other instances of fraudulent conduct against a distributor. And it is unlikely that Amana and the Plaintiff will have any future business dealings.[14]

In favor of sustaining a substantial punitive damages award, the Court is mindful that though the Plaintiff suffered only economic harm, the Court can hardly think of a more reprehensible case of business fraud. Because of Amana's "intentional malice,[15] trickery, [and] deceit," this case certainly falls at the high end of reprehensibility in the economic harm category of punitive action claims. The Court finds the evidence of the fraudulent scheme, plus Amana's conduct in openly associating itself with Dr. Adam, an individual it knew to be of questionable character, as well as Amana's management's response once the scheme was brought to its attention, to be quite disturbing.

In *State Farm*, the Supreme Court spent much time discussing the ratio between compensatory damages and punitive damages without setting "any bright-line ratio which a punitive damages award cannot [constitutionally] exceed." *See State Farm*, —— U.S. ——, ——, 123 S.Ct. 1513, 1523–24, 155 L.Ed.2d 585. Importantly, the Supreme Court suggested that where compensatory damages are significant, the Due Process Clause might require the punitive damages to be no more than equal to the compensatory damages. *See id.* But, clearly, depending on the facts of the case, the Due Process Clause will permit higher awards. Nevertheless, the Court accepts that, after *Gore* and *State Farm*, the award probably cannot exceed a 10–to–1 ratio. *See id.* Finally, with our jurisprudence's history of doubling, trebling

---

14. Furthermore, it does not appear that Amana will have any future dealings with Dr. Adam. The Amana division at issue in this lawsuit (Amana Appliances) is now under new ownership, having been purchased by the Maytag Corporation. Messrs. Montross, Prusha and Boyle are no longer employed by Amana.

15. During oral argument Amana disputed any finding of intentional malice. The Court thinks otherwise. The jury found Amana's conduct in deliberately selecting and soliciting the Plaintiff in their scheme to recover the $2.4 million debt, not only "willful and wanton" but "directed specifically at the Plaintiff Eden Electrical." *See* Answers to Interrogatories Nos. 6 & 7, *supra*.

and quadrupling damages to deter and punish, a 4-to-1 ratio "might be close to the line of constitutional impropriety." *See id.*

Specifically, this Court reads *State Farm* to mean that even where all the reprehensible considerations are present, but where compensatory damages are significant, the punitive damages award cannot ordinarily exceed the 10-to-1 ratio and still be constitutional. Thus, even where a plaintiff has suffered a physical harm as a result of a recidivist defendant's intentional and malicious disregard for the health and safety of others, and the defendant targeted his victim because the victim was financially vulnerable, still that plaintiff's punitive damages award could probably not constitutionally exceed the 10-to-1 ratio. When the Court compares the punitive damages award in the instant case (an economic harm case) to this hypothetical case, surely it must conclude that the Plaintiff's 8:5-to-1 ratio award is constitutionally excessive. A lesser ratio must be established to make the award satisfy the Fourteenth Amendment.

So what is the constitutional limit on punitive damages in the instant case? In ascertaining this figure, the Court is mindful of its findings that though this is an economic harm case, it can hardly think of a more reprehensible case of business fraud. The Court concludes that if the punitive damages award is to have any punitive or deterrent effect—the stated rationale of such damages—then it is apparent that Amana's wealth and financial condition *must* be taken into consideration. This conclusion merits some discussion.

As noted above, the Supreme Court has consistently recognized that punitive damages serve the twin aims of punishment and deterrence. *See State Farm,* ——

U.S. ——, ——, 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585 ("[P]unitive damages serve a broader function; they are aimed at deterrence and retribution."); *Gore,* 517 U.S. at 568, 116 S.Ct. 1589 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."). The Supreme Court of Iowa has also recognized that punitive damages are meant to punish and deter. *See McClure,* 613 N.W.2d at 230. If the punitive damages sanction is to continue to meet its twin aims, must not a court consider who is to be punished or deterred when ascertaining whether an award is constitutionally permissive? This question answers itself because an award that would effectively punish and deter General Motors or Bill Gates would have to be many, many, many times greater than an award which would adequately punish and deter, say, the local one-store druggist. Otherwise, the potential punitive damages sanction might risk becoming merely an insignificant additional cost of doing business to some wealthy entities.

The Finns have recognized this principle: in Finland, to ensure appropriate deterrence and retribution, speeding ticket fines are based upon the violator's income. *See* Steve Stecklow, *Finnish Drivers Don't Mind Sliding Scale, But Instant Calculation Gets Low Marks,* Wall St. J., Jan. 2, 2001, *available at* www.stayfreemagazine.org/public/wsj_finland.html ("In Finland, traffic fines generally are based on two factors: the severity of the offense and the driver's income. The concept has been embedded in Finnish law for decades: When it comes to crime, the wealthy should suffer as much as the poor. Indeed, sliding-scale financial penalties are also imposed for offenses ranging from shoplifting to securities-law violations.").[16]

---

**16.** Sheriff Andy Taylor of fictional Mayberry, North Carolina, also recognized that if a fine

is to effectively punish and deter an individual, the individual's financial status must be

Furthermore, in pre-*Gore* cases the Supreme Court noted that while the wealth of the wrongdoer must not be unduly emphasized, a jury may consider the defendant's wealth in determining punitive damages. *See TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 463–64, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Haslip*, 499 U.S. at 21–22, 111 S.Ct. 1032.

The Court concludes that it must throw into the balance and otherwise take into account Amana's net worth when considering the maximum punitive damages amount the Due Process Clause will permit. Amana is a moderately wealthy business enterprise, having a relevant net worth of $325 million.

After considering all of the above, the Court concludes that the Due Process Clause permits a maximum punitive damages award against Amana in the amount of $10 million, an amount which is 4.76 times the compensatory damages award, and approximately 3% of Amana's net worth.

Because the Court is reducing the verdict as a matter of constitutional law, it need not issue a remittitur or otherwise obtain the Plaintiff's consent. *Compare Ross*, 293 F.3d at 1049–50 *and Thorne v. Welk Investment, Inc.*, 197 F.3d 1205, 1212 (8th Cir.1999). Amana's motion is made pursuant to Federal Rule of Civil Procedure 59(e). Rule 59(e) provides authority for the Court to alter or amend a judgment. Of course, had the Court determined the punitive damages award to be excessive under Iowa state law or based

upon prejudice, the Court would have had to treat Amana's motion as a Rule 59(a) request for a new trial, and offer the Plaintiff a remittitur before altering the award. But where this Court concludes that a punitive damages award is constitutionally excessive, it may amend the judgment as a matter of law. The *Ross* court has explained:

> A constitutionally reduced verdict ... is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court ... a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Ross*, 293 F.3d at 1049 (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir.1999)).

## III. Conclusion

IT IS THEREFORE ORDERED that the Separate Defendant Amana's Motion to Alter or Amend Punitive Damages Judgment (Doc. # 237) be, and it is hereby, GRANTED in part and DENIED in part. The jury's punitive damages award is hereby reduced from $17.875 million to $10 million.

considered. In his role as justice of the peace, Sheriff Taylor explained why he fined Mr. Williams, a wealthy New York entertainer, $100 for a traffic violation when the fine ordinarily was $5: "I will admit that the fine for what he done is usually no more than five dollars. But, [for] most folks in these parts, five dollars puts a pretty good-sized crimp in their pocket books, don't you see. But now

... a little old five or ten dollar bill couldn't have meant less to Mr. Williams. So I just had to heavy up the price so he'd feel the weight of the law a little bit...." *See Make Room for Daddy: The Danny Thomas Show* (CBS television broadcast Feb. 15, 1960) (episode "Danny Meets Andy Griffith," the pilot episode of *The Andy Griffith Show* ).

IT IS FURTHER ORDERED that the Separate Defendant Amana's request for an oral argument on its Motion to Alter or Amend Punitive Damages Judgment (Doc. # 248) be, and it is hereby, DENIED as moot.[17]

## *AMENDED JUDGMENT*

The Court hereby orders that the District Court Clerk enter this Amended Judgment. This Amended Judgment supercedes the original Judgment in a Civil Case entered February 3, 2003 (Doc. # 229).

The above styled case came on for trial before the Court and a jury in January 2003, and the issues having been duly tried and the jury having rendered its verdict, judgment is hereby entered in favor of the Plaintiff Eden Electrical, Ltd. and against the Defendant Amana Company, L.P. in the sum of Two Million One Hundred Thousand ($2,100,000.00) Dollars in compensatory damages and Ten Million ($10,000,000.00) Dollars in punitive damages in accordance with the Court's memorandum opinion and order of even date herewith. Interest will accrue as provided by law from the date of the original judgment, February 3, 2003.

---

**17.** The District Court Clerk may remove Docs. # 234 and 236 from the pending motions list.

The Court ruled on these two motions in its March 28, 2003, order (Doc. # 258).