689 A.2d 158

SHALOM ALMOG AND IRIT ALMOG, PLAINTIFFS–RESPONDENTS/CROSS–APPELLANTS, v. ISRAEL TRAVEL ADVISORY SERVICE, INC., A NEW JERSEY CORPORATION; CELIA SHAR AND MARILYN ZIEMKE, DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS, AND BEN AMI GELLER, DEFENDANT–RESPONDENT/CROSS–APPELLANT, AND ISRAEL RODRIGUE AND ABIR TRAVEL & TOURS LTD., A CORPORATION OF THE STATE OF ISRAEL, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued January 28, 1997—Decided February 25, 1997.

Before Judges PRESSLER, HUMPHREYS and WECKER.

*Christopher V. Langone,* admitted *pro hac vice,* argued the cause for appellants/cross-respondents (*Broder & Associates,* attorneys; *Eugene J. Sullivan* of *Peckar & Abramson,* of counsel; *H. Neil Broder,* on the brief).

*David Feinsilver* argued the cause for respondents/cross-appellants Shalom Almog and Irit Almog (*The Feinsilver Law Group,* attorneys; *Mr. Feinsilver,* on the brief).

*Andrew S. Berns* argued the cause for respondent/cross-appellant Ben Ami Geller (*Lampf, Lipkind, Prupis, Petigrow & Labue,* attorneys; *Mr. Berns,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Following the five-week trial of this defamation action, the jury returned compensatory damage verdicts against defendants Israel Travel Advisory Service, Inc. (ITAS), and its owners, Celia Shar and her daughter Marilyn Ziemke, all New Jersey residents, in favor of plaintiffs Shalom Almog and his wife Irit Almog and in favor of defendant/cross-claimant Ben Ami Geller, all Israeli citizens. More specifically, the jury awarded Shalom Almog $525,000 for injury to reputation, $775,000 for loss of income, and $24,000 on a book account claim for a total of $1,324,000. It awarded Irit Almog $200,000 for her *per quod* claim and Geller $40,000 for loss of reputation. The jury also determined that both Shalom Almog (plaintiff or Almog) and Geller were entitled to punitive damages, and, following a second trial on that issue, the same jury awarded punitive damages to Almog of $4,500,000 and punitive damages of $1,000,000 to Geller. The jury found no cause for action on defendants' counterclaim against plaintiff. Defendants appeal. Plaintiffs and Geller cross-appeal. We affirm the jury's verdicts in all respects.

This action has a tortuous procedural and factual history. For purposes of addressing the issues raised on this appeal, the following brief factual recitation suffices. The jury could have found from the evidence that defendants Shar and Ziemke, New Jersey residents living and working in Livingston, are in the business of organizing tours to Israel for American travellers. During the period in controversy, the business was highly successful, ITAS sending between 3,000 and 3,500 tourists to Israel annually at a net profit of $500 each. The evidence adduced at the punitive damage hearing supports the finding that in more recent years and at the time of trial, the business was even more financially successful.

ITAS's *modus operandi* was to arrange for the international flights for its groups through its American agent but to turn all the Israeli arrangements—hotels, meals, sightseeing, entertainment, transportation, and the like—to a licensed Israeli land tour

operator. The groups would then be conducted by a licensed Israeli tour guide acting as an independent contractor under arrangement with the land tour operator. In 1984, the Israeli land tour operator with whom ITAS dealt was Trans Global Travel. Geller, who worked as a guide with Trans Global, frequently guided ITAS groups. ITAS's financial arrangement with Trans Global, apparently typical of the Israeli tourist industry, was that Trans Global billed ITAS its actual costs incurred in its arrangements for the groups plus a flat fee per tourist, an arrangement referred to as "net-net cost plus handling fee." The handling fee at that time was $60 per tourist, and the land tour operator shared it with the American travel agency with whom ITAS worked.

Sometime in 1984 Geller solicited Almog, then a colonel in the Israeli Defense Forces, to enter the travel business upon his retirement from the army and introduced him to Shar and Ziemke. In August 1985, when Almog retired from the army, Trans Global had split into two entities, TGT Travel Ltd. and Transglobal Travel Ltd. Geller and ITAS both elected to stay with TGT, and Almog joined them as a TGT employee, assigned exclusively to the ITAS account. A close working relationship developed between Almog and Geller. A close working relationship also developed between Almog and Shar and Ziemke, who were extremely pleased with his performance. By January 1986, defendants had increased TGT's handling fee to $85. In June of that year, as the result of agreements between TGT and Transglobal, ITAS, Geller and Almog all moved to Transglobal. Because of Almog's and Geller's importance to the ITAS account, Almog was given a minority ownership interest in Transglobal and Geller received, in addition to his salary from Transglobal, $10 out of every handling fee. In March 1988, Almog persuaded ITAS to move its business to another land tour operator, Abir Travel & Tours, Ltd., owned by defaulting defendant Israel Rodrigue. Geller moved to Abir as well and continued to receive $10 of the handling fee. Abir received the same. Almog received the balance of $65, if defendants' testimony were accepted that the

handling fee remained at $85, or the balance of $80, if Almog's testimony that it had been increased to $100 were credited. In any event, Almog testified and the jury was free to believe that by September 1988, Almog's income was $190,000 annually.

In the summer of 1988, relations between Almog and Geller became strained after Geller accused Almog of becoming too self-important. In October 1988, Rodrigue told Geller that Almog was holding back from ITAS by charging for services not actually rendered the touring groups and by not remitting certain rebates. In that month, Geller and Rodrigue went to Livingston with documents they thought demonstrated those charges. The jury was free to conclude from the evidence that not only were these relatively minor matters, involving the cost of box lunches, the use of hostesses, the quality of buses engaged, and a small hotel prepayment discount, but also that Almog's disposition of these matters was perfectly proper and in accord with industry standards and practices. In any event, and without inquiring of Almog at all, Shar and Ziemke immediately determined to fire him. They prepared and signed a letter addressed "To Whom it May Concern," advising that Almog no longer represented ITAS in any way and that vendors and suppliers should deal only with Geller and Rodrigue. When Geller and Rodrigue returned to Israel and showed Almog the letter, Almog telephoned Ziemke and Shar to ask for a meeting. They berated him over the telephone, accused him of embezzling $150,000 and of camouflaging invoices, and called him "inept and schizophrenic." Almog immediately went to Livingston, and during the course of his meeting there with Shar and Ziemke, they also accused him of having fraudulently obtained from them $39,000 by way of two checks drawn to his order the previous summer.

The jury was free to find from the evidence that Almog returned to Israel to look for another job but was unable to find one either in the tourist industry or indeed in any other industry in Israel because of the savage campaign of slander and libel that Shar and Ziemke then maliciously undertook against him both in

the United States and in Israel. It was not until 1990 that Almog was finally able to find work at a greatly reduced salary as a plant manager in the Dominican Republic. The jury was free to find that Shar and Ziemke had falsely, repeatedly and to great effect accused him of gross theft and of having an extramarital affair with his ex-wife. The jury could also have found that they published these stories to anyone who would listen, including Almog's former commanding officer, who advised him to leave Israel as his reputation and prospects were finished there. Both Almog and his wife gave testimony that the jury was free to credit respecting the substantial physical and emotional harm done to them as a result of defendants' actions.

Geller continued in defendants' good graces until August 1990. By that time, ITAS had returned its business to Transglobal, and Geller, by then acknowledged as a "top guide" in Israel, had followed. In the summer of 1990, Geller was hospitalized after suffering a stroke. When he was released from the hospital, he entered into an agreement with Transglobal, whereby Transglobal promised him twenty days of work each month until February 1991, when the arrangement· would be reevaluated. Under the terms of that agreement, Geller was not required to work exclusively on ITAS tours and his per-tourist fee was increased to $15. The jury was free to find from the evidence that when Transglobal's principal, Benny Sivan, advised Shar and Ziemke of this agreement, they became enraged, vowed to "punish" Geller, called him a thief and refused to permit him to guide the tour scheduled for October. Sivan thereupon refused to handle that tour, and ITAS then severed its relationship with Transglobal. Thereafter Transglobal entered into a relationship with an American competitor of ITAS [1] and Geller continued to work both for Transglobal and other companies. At that point defendants mounted a retaliatory defamatory campaign against Geller, accusing him to all and

---

[1] The ensuing litigation between ITAS and that competitor is the subject of *Israel Travel Advis. Serv. v. Israel Iden. Tours,* 61 *F.*3d 1250 (7th Cir.1995), affirming the dismissal of ITAS's claims.

sundry of having seduced the daughter of a major Israeli restaurant owner and causing Jeller and his wife to be subject to criminal investigation by the Israeli tax authorities, by whom he was eventually exonerated after suffering out-of-pocket losses, impairment of reputation, and emotional distress.

In summary, we are satisfied from our review of this record that the jury had an ample evidential basis from which to conclude that defendants Shar and Ziemke and their company took concerted, malicious and purposeful action over a significant period of time to destroy both Almog and Geller as respected members of their community, that they did so with total disregard of the truth or of the personal consequences to them and their families, and that in large measure they succeeded.

The Almogs instituted this action in October 1989 in the Law Division, Essex County, by filing a twenty-nine count verified complaint against ITAS, Shar, Ziemke, Geller, Rodrigue and Abir, asserting a variety of causes, including defamation, intentional infliction of emotional harm, breach of contract, tortious interference with contractual relations and prospective economic advantage, and book account debts. Defendants ITAS, Shar and Ziemke responded by filing an action in Israel against the plaintiff, seeking over half a million dollars in damages from him on theories of trade libel and misappropriation of funds, making sure, as the jury was free to find, that the details of their cause of action were reported in the Israeli press. Eventually, the contours of this litigation were drawn by Rodrigue and Abir defaulting, the trial court's denying defendants' motion for dismissal on the ground of *forum non conveniens,* the filing by defendants of an amended answer and counterclaim, Geller's filing of an amended answer and cross-claim charging defendants with various defamation causes, and defendants' abandonment of their Israeli action after entry by the Law Division of an order enjoining them from proceeding with their suit there, an order we affirmed on appeal by leave granted under Docket Number A–5275–90.

This five-week trial ensued. During the course of his summation, plaintiffs' attorney withdrew their affirmative claims against Geller. The trial judge charged the jury and sent it out to deliberate. It was during deliberations that the anomalous events giving rise to several main issues on appeal took place. In sum, the trial judge had reserved on defendants' application to apply Israeli rather than New Jersey law to plaintiffs' causes of action. Without deciding that issue, the trial judge had correctly charged the jury on New Jersey law. After the jury retired to commence its deliberations, the judge concluded that Israeli law should apply and since there are no civil juries under Israeli law, he further concluded that he should decide the case without a jury, rendering a bench verdict but deciding to take the verdict of the jury, which had no idea of what was then transpiring, as an advisory verdict. Beyond the conceptual problems posed by this procedure, there were practical problems as well, since the judge had, from time to time during the trial, been attending to other legal matters both on the bench and in chambers, having explained to the jury that his presence was not required one hundred percent of the time. Consequently, although the judge undertook to render a bench verdict, it appeared from the record that he had not given the trial his full attention.[2] Nevertheless, he found defendants liable to both plaintiffs and Geller in defamation; awarded Geller total compensatory damages of $200,000; awarded Almog damages for loss of income of just over $900,000; reserved on the damage to reputation claim; reserved on Irit Almog's *per quod* claim; dis-

---

[2] Because we have decided that it is the jury verdict that must stand, not the bench verdict, we need not further address this aspect of the judge's conduct during the trial, since it did not affect the jury's verdict. We appreciate that the judge was motivated by a commendable desire to expedite other matters for which he was responsible and that he may have obtained the consent of counsel to his conduct. Nevertheless, his place was obviously on the bench and attending to the proceedings throughout. Beyond that, the judge's conduct made it impossible for him to render a bench verdict since he had missed some of the evidence. In view, however, of the judge's characteristic skill and diligence, we need make no further comment on what we are satisfied was a procedural lapse that will not be repeated.

missed defendants' misappropriation counterclaim; reserved on the punitive damages claims; and sanctioned Shar $500 for each expletive she used during the course of her pretrial deposition, which was read into evidence since she did not appear at trial on the ground of illness.

After the foregoing events took place in the courtroom, the jury, entirely unaware of what had occurred during its deliberations, returned with the verdict we have already referred to, namely, a total compensatory award of $1,324,000 for Shalom Almog, $200,-000 for Irit Almog, and $40,000 for Geller. A date was set for a supplementary trial on punitive damages, the jury returning five weeks later for that purpose. Again unaware that its fact-finding would not be dispositive, it returned the punitive damages awards we have described, namely, $4,500,000 for Almog and $1,000,000 for Geller.

We consider the issues raised on appeal in light of the foregoing recitation. We preface our specification of the issues, however, with this observation. *R.* 2:6–2(a)(5) requires that the party's legal argument be made under "appropriate point headings." Those are the arguments we consider. We are aware that by their copious footnotes, defendants suggest other legal issues. Raising legal issues on appeal in that manner is, however, wholly improper, putting the responding party at a disadvantage that implicates due process concerns. The respondent on appeal has a right to know precisely what legal arguments are being made and, in our view, need not respond to oblique hints and assertions made in footnotes. We do not suggest that footnotes in a brief are necessarily improper. They may be useful in limited situations for purposes of clarification of relevant ancillary matters or the like. We will not, however, countenance the raising of additional legal issues by that technique. Accordingly, we confine our address of the issues to those arguments properly made under appropriate point headings. We are also constrained to note that appellant's footnotes were printed in type considerably smaller than permitted by *R.* 2:6–10, so small, in fact, as to be barely legible. We

regard this violation of the format rule as serious. If a party intends the court to read the footnotes, they will have to be printed in conformance with the rule.

Defendants argue (1) that their motion to dismiss on *forum non conveniens* grounds should have been granted, (2) that the bench verdict cannot stand because of the judge's inattention and his improper application of Israeli law and its effect of denying defendants their right to a trial by jury, (3) that there was insufficient competent evidence of defamation to warrant sending the case to the jury, (4) that the judge erred in not making individualized determinations as to each of the three defendants (and by inference that the unallocated jury verdict suffered from the same defect), (5) that the judge erred in barring evidence proffered in aid of their truth defense, and (6) that they were unduly prejudiced by plaintiffs' attorney's attack on their character during his closing argument. Plaintiffs and Geller cross appeal from the judge's decision to render a bench verdict based on Israeli law, assert that New Jersey law applies, and argue that the jury's verdict on both compensatory and punitive damages be reinstated as the final verdict in the case.

We deal with the issues seriatim. We affirm the pretrial ruling denying the motion for dismissal on *forum non conveniens* grounds. We recognize that a cause of action involving citizens of different countries, events occurring in different countries, and evidence and witnesses located in different countries is inevitably affected by convenience considerations. We are, however, guided by well-settled principles. First, the plaintiff's choice of forum will ordinarily not be disturbed except upon a showing that it is demonstrably inappropriate. *Civic Southern Factors Corp. v. Bonat*, 65 *N.J.* 329, 332–333, 322 *A*.2d 436 (1974); *Am. Home Products Corp. v. Adriatic Ins.*, 286 *N.J.Super.* 24, 35, 668 *A*.2d 67 (App.Div.1995). Application of that standard requires a consideration of both private interest and public interest factors. Private interest factors include accessibility to sources of proof, the availability of compulsory process, whether there are premises to be

viewed, and the practical concerns making a case susceptible to effective trial, including the enforceability of the ultimate judgment. The public interest factors address the burden imposed on the chosen forum as balanced against the forum's interest in the matter. *See D'Agostino v. Johnson & Johnson, Inc.,* 225 *N.J.Super.* 250, 262–263, 542 *A.*2d 44 (App.Div.1988), *aff'd,* 115 *N.J.* 491, 559 *A.*2d 420 (1989). *And see Mowrey v. Duriron Co.,* 260 *N.J.Super.* 402, 409–410, 616 *A.*2d 1300 (App.Div.1992); *Westinghouse v. Liberty Mut. Ins.,* 233 *N.J.Super.* 463, 469–470, 559 *A.*2d 435 (App.Div.1989). In the end, the question is simply whether plaintiff's choice of forum imposes a real hardship on defendants or results in undue harassment and vexation to them or to the legal system. *See, e.g., Creative Business v. Magnum,* 267 *N.J.Super.* 560, 572, 632 *A.*2d 298 (App.Div.1993).

We conclude, essentially for the reasons stated by the motion judge who denied the application, that there was nothing manifestly inappropriate about plaintiffs' choice of forum. We further note that many of the witnesses were here, and defendants themselves are residents here. Defendants had conceded the applicability of international treaties for the purpose of obtaining depositions in Israel of Israeli residents who would not voluntarily appear here. *See also R.* 4:11–5. Such documentary evidence as was not located here was readily transportable. All defendants' books and records are here. Moreover, there was no showing by defendants that they have assets in Israel available for satisfying a judgment. They have, however, considerable wealth available in New Jersey for that purpose. Finally, New Jersey has a substantial interest in the matter since the conduct of individuals resident here and a corporation doing business here was the matter in issue.

We address next the issues arising out of the jury-trial/bench-trial anomaly. The key question is choice of law. We conclude that New Jersey law applies. Consequently, we also conclude that the trial judge erred for that reason, if for no other, in rendering a bench verdict. And we are persuaded, under the unique circumstances here, that the jury verdict as to both

compensatory and punitive damages must therefore be deemed to constitute the final judgment in the case.

First as to choice of law. As we have noted, egregious misconduct was committed in New Jersey, elsewhere in the United States, and in Israel by New Jersey residents. Malicious defamation was published in and from this State. Key events occurred in New Jersey, including the two fateful meetings in Livingston we have already described. Underlying contracts and agreements were made here. A fuller remedy is available to the victims under New Jersey law than in Israel in respect of the scope of damages. The question is whether these significant contacts with New Jersey weight the application of the governmental interest test in favor of New Jersey law or Israeli law. We have no doubt in light of the totality of the circumstances that New Jersey's interest in the controversy as a whole is paramount to Israel's.

As the Supreme Court recently explained in *Gantes v. Kason Corp.*, 145 *N.J.* 478, 484–485, 679 *A.*2d 106 (1996), conflicts of law analysis requires the court first to identify the disparity in the law of each of the jurisdictions and then to identify the governmental policies of each underlying its own law. The parties agree that the codified defamation law of Israel specifies an apparently greater scope of defenses than does New Jersey's, although it is not at all clear that defendants' conduct would be any more defensible in Israel than here. The heart of the conflicts concern is, however, punitive damages. They are available under New Jersey law, not under Israeli law. We are satisfied that this difference alone is sufficient to invoke New Jersey law, particularly since a good deal of the defamatory conduct took place in this State as well as elsewhere in the United States. *Gantes* informs that conclusion. As the Court there made clear, this State has a significant interest in deterring wrongful conduct by its residents. The goal of our tort law is not only to afford the victim a remedy for a wrong but to deter the resident tortfeasor and others who would commit such wrongs from engaging in that wrongful conduct. *Id.* at 489, 679 *A.*2d 106. Deterrence of egregiously wrong-

ful conduct is also what punitive damages are all about. Moreover, we do not see, and it has not been suggested to us with any particularity, how Israeli law would be offended by the application of New Jersey law in this regard. Certainly the fact that it does not award punitive damages is not indicative of an interest in whether New Jersey law allows assessment of a punitive damages award against a New Jersey resident. The point, of course, is that its citizens are not being so assessed. By the same token, we do not see how Israeli law can reasonably be regarded as offended by one of its citizens being fully vindicated in the courts of another jurisdiction. In sum, New Jersey's strong deterrent interest does not appear to collide in any appreciable way with the policy of Israeli law.

■ Having concluded that New Jersey's defamation law applies, we must next determine the effect of that decision on the trial events that transpired from the time the jury retired to deliberate. This much is clear—it renders the bench verdict based on Israeli law a nullity. The issue is whether the bench verdict is also merely a superfluity, permitting the jury's verdicts to stand. We answer this question in the affirmative as well.

The courts of this State have not addressed in a reported opinion the question of whether an advisory jury verdict is ever susceptible of elevation as the judgment in the cause. We are aware that other jurisdictions have considered the question and generally conclude that such elevation is ordinarily inappropriate for several reasons. First, it is not reasonable for the trial judge to be accorded the discretion to choose, after the fact, between the court's determination and the jury's. More significantly, it is recognized that advisory juries ordinarily consider fewer than all the issues and that even where they consider all the issues, trial strategy is, to a significant extent, dependent upon who the ultimate fact finder will be. Consequently, issues of procedural due process are implicated when the judge defers, after the fact and without prior notice to the parties, to the advisory jury as the final arbiter. *See, e.g., Thompson v. Parkes,* 963 *F.*2d 885, 887–

890 (6th Cir.1992); *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 *F*.2d 49, 53 (3d Cir.1989); *Pradier v. Elespuru*, 641 *F*.2d 808, 811 (9th Cir.1981). Those concerns are obviously not, however, implicated here and defendants do not object to "elevation" of the jury verdict as a conceptual matter. The point, of course, is that it was not until the jury retired to deliberate, after summations and charge, that its status as the final arbiter was challenged. The lawyers proceeded tactically on the understanding that this was a jury trial, as did the court. Nor did the jurors have any inkling during their deliberations that their status was anything but that of ultimate finders of the facts. That was what the judge had told them, and that is how they proceeded. The same is true of the later punitive damages trial. Thus, nothing to the contrary said by the trial judge entered into or affected or tainted the way the lawyers tried the case to the jury or the way the jury deliberated. In effect, this jury never functioned as or was constituted or denominated as an advisory jury. Consequently, there is no prejudice we can perceive in accepting the jury's fact-finding as the final verdict. On the other hand, not to do so would impose unnecessarily and egregiously on the parties and the court system. There is no reason to permit that to happen in the unique and anomalous circumstances here.

The balance of defendants' arguments require little discussion. *R.* 2:11–3(e)(1)(A), (B), and (E). The evidence of defendants' intentional, malicious and egregious wrongdoing was overwhelming. The defendants, moreover, acted in concert and as a unit, each endorsing and cooperating in the other's actions. Indeed, most of the actions were joint. The three defendants were represented by a single attorney. There was no claim by any of the three against any of the others for indemnification or contribution. In these circumstances we are satisfied that the unitary verdict of joint liability without individualized verdicts as to each or allocation of responsibility among them was entirely appropriate. We note, moreover, that defendants did not object on this ground at trial to the judge's charge, which instructed the jury

that they could find defendants individually liable or jointly and severally liable, or to the implementing interrogatories submitted to the jury. We are convinced that if it was error not to require individualized verdicts, that error was not, in the circumstances, plain error.[3]

■ We are satisfied that the trial judge properly exercised his discretion in his evidential rulings. The proffered excluded testimony had not previously been disclosed in discovery and would have been unfairly prejudicial to plaintiffs. The judge did not err in its exclusion. *See R.* 4:17–7. *And see Lindenmuth v. Holden,* 296 *N.J.Super.* 42, 52–53, 685 *A.*2d 1351 (App.Div.1996). We further note that in the main, the hearsay evidence of Almog was fully corroborated. Its admission, in the light of the evidence as a whole, was not harmful error. Nor can we conclude that, taken as a whole and in context, the summation by plaintiffs' counsel was unduly prejudicial. *See, e.g., Daisey v. Keene Corp.,* 268 *N.J.Super.* 325, 336, 633 *A.*2d 979 (App.Div.1993).

■ There is one last matter we address. Defendants have not challenged the quantum of punitive damages allowed by the jury. Nevertheless, and because of the Supreme Court's expressed concern with runaway punitive damage verdicts in *Herman v. Sunshine Chemical Specialties, Inc.,* 133 *N.J.* 329, 338, 627 *A.*2d 1081 (1993), we have carefully examined the evidence adduced at the punitive damages trial. Suffice it to say that the awards were commensurate with the evidence of defendants' wealth and represent, considering the egregious nature of the torts, an acceptable ratio between compensatory and punitive damages. Most significantly, however, following the jury's return of the punitive damages verdict, the trial judge, in an abundance

---

[3] We need not address, because the question is not before us, whether defendants could in the future assert contribution or indemnification rights against each other. *See, e.g., Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc.,* 292 *N.J.Super.* 62, 678 *A.*2d 293 (App.Div.), *certif. granted,* 146 *N.J.* 568, 683 *A.*2d 1163 (1996).

of caution, afforded defendants an opportunity to demonstrate by way of discrete financial records any alleged excessiveness. Defendants failed in the end to take advantage of that opportunity. We are satisfied that they thereby waived their right to complain of the quantum.

The bench verdict of the trial judge is vacated. The jury verdicts respecting liability, compensatory damages, and punitive damages are affirmed in all respects and shall be entered as the final judgment in the cause.