928 A.2d 935 (2007)
395 N.J. Super. 358
In re VIOXX LITIGATION.
Superior Court of New Jersey, Appellate Division.
Argued March 27, 2007.
Decided July 31, 2007.
*936 Jonathan Miller argued the cause for appellants (Locks Law Firm, and Williams Cuker and Berezofsky, Cherry Hill, attorneys; Mr. Miller, James J. Pettit and Esther Berezofsky, on the brief).
Charles W. Cohen argued the cause for respondent Merck & Co., Inc. (Hughes Hubbard & Reed, Jersey City, attorneys; Mr. Cohen, of counsel and on the brief; Karl R. Thompson (O'Melveny & Myers) *937 of the DC bar, admitted pro hac vice, and Eric Blumenfeld, on the brief).
Before Judges KESTIN, WEISSBARD and PAYNE.
The opinion of the court was delivered by
PAYNE, J.A.D.
In this matter, ninety-eight plaintiffs residing in England and Wales appeal from the order of Judge Higbee dismissing, pursuant to the doctrine of forum non conveniens, their personal injury lawsuits against defendant, Merck & Co., Inc., the developer and manufacturer of the prescription medicine VIOXX, and Merck Sharp & Dohme, Ltd., its U.K. subsidiary, as improperly instituted in New Jersey. We affirm.

I.
Following the disclosure of scientific studies suggesting an association between long-term use of VIOXX, a medication used in the treatment of symptoms of arthritis, and an increased risk of heart attack, and the withdrawal of the drug from the market, personal injury law suits commenced to be filed against Merck in New Jersey, where Merck maintains its corporate headquarters. After mass tort designation was given to the litigation by the New Jersey Supreme Court, the cases were centralized for administration in Atlantic County and assigned for management and trial to Judge Higbee. Over fifteen thousand cases are presently pending.
In 2005, complaints were filed in New Jersey on behalf of the ninety-eight plaintiffs from England and Wales (the "U.K. plaintiffs") who are appellants in the present matter. Their master complaint, dated November 14, 2005, sets forth product liability causes of action based upon defective design and failure to warn, as well as claims of breach of the New Jersey Consumer Fraud Act, breach of express warranty, wrongful death and survivorship, and loss of consortium. Plaintiffs seek both compensatory and punitive damages, as well as attorneys' fees and costs.
In November 2005, Merck filed a motion to dismiss the complaints of all plaintiffs residing outside of the United States on forum non conveniens grounds. Judge Higbee determined to hear the motion as it applied to the U.K. plaintiffs first and, after full briefing and argument, dismissed their claims as improperly brought in New Jersey. Her conditional order of dismissal required Merck to submit to service of process and jurisdiction in the U.K.; to agree to satisfy any final judgment rendered by a U.K. forum; to forego any statute of limitations defense applicable because of the pendency of suit in the United States; and to permit plaintiffs, under specified conditions, to return to New Jersey if the U.K. declined to accept jurisdiction over their claims. This appeal followed.

II.
The equitable doctrine of forum non conveniens was "crystallized" by the United States Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), and the principles expressed there were adopted in New Jersey in Gore v. U.S. Steel Corp., 15 N.J. 301, 104 A.2d 670 (1954), cert. denied, 348 U.S. 861, 75 S.Ct. 84, 99 L.Ed. 678 (1954). State and federal precedent have not since diverged. The New Jersey Supreme Court in Gore described the doctrine as "non-discriminatory," observing that it does not "turn on considerations of domestic residence or citizenship *938 as against foreign residence or citizenship," but rather, "on considerations of convenience and justice." Id. at 311, 104 A.2d 670. For this reason, it may be applied both for and against both domestic and foreign plaintiffs. "It is true that under the doctrine an action by or against a resident will ordinarily not be dismissed as being in an inconvenient forum, but it is also true that ordinarily an action by or against a nonresident will not be dismissed as such." Ibid.
It is only in those exceptional cases where a weighing of all of the many relevant factors, of which residence is but part, decisively establishes that there is available another forum where trial will best serve the convenience of the parties and the ends of justice, that the doctrine is ever invoked.
[Ibid.]
See also Civic Southern Factors v. Bonat, 65 N.J. 329, 333, 322 A.2d 436 (1974). Similarly, see Sinochem Int'l Co., Ltd., v. Malaysia Int'l Shipping Corp., ___ U.S. ___, ___, 127 S.Ct. 1184, 1190, 167 L.Ed.2d 15, 24 (2007); American Dredging Co. v. Miller, 510 U.S. 443, 447-49, 114 S.Ct. 981, 985-86, 127 L.Ed.2d 285, 293-94 (1994); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419, 426 (1981).
A determination to dismiss an action on the equitable ground of forum non conveniens lies within the discretion of the trial judge, and thus a grant of such a motion is reviewed under an abuse of discretion standard. Kurzke v. Nissan Motor Corp. in U.S.A., 164 N.J. 159, 165, 752 A.2d 708 (2000); Civic Southern Factors, supra, 65 N.J. at 333, 322 A.2d 436. Accordingly, we are not free to substitute our judgment for that of Judge Higbee unless a clear misuse of her discretion is shown. Kurzke, supra, 164 N.J. at 165, 752 A.2d 708.
Merck, as the entity invoking the doctrine of forum non conveniens, bears the burden of establishing that New Jersey is not a convenient forum for this litigation. Piper Aircraft, supra, 454 U.S. at 255, 102 S.Ct. at 266, 70 L.Ed.2d at 435. However, less deference is accorded to plaintiffs' forum choice in this case than would normally be accorded because of plaintiffs' residence in the U.K., not in this State. Id. at 255-56, 102 S.Ct. at 266, 70 L.Ed.2d at 436. "When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." Ibid.

III.
The forum determination in this case requires a two-step analysis, commencing with an evaluation of whether the U.K. constitutes an adequate alternative forum in which the litigation can be brought. Gore, 15 N.J. at 305, 104 A.2d 670 ("a court may decline jurisdiction where there is available another forum where trial will best serve the convenience of the parties and the ends of justice"). "Ordinarily, this requirement will be satisfied when the defendant is `amenable to process' in the other jurisdiction." Piper Aircraft, supra, 454 U.S. at 255 and n. 22, 102 S.Ct. at 265 and n. 22, 70 L.Ed.2d at 435 and n. 22 (quoting Gilbert, supra, 330 U.S. at 506-07, 67 S.Ct. at 842, 91 L.Ed. at 1061). However, in those "rare circumstances" in which the remedy offered by the alternative forum is "so clearly inadequate or unsatisfactory that it is no remedy at all," the requirement of an adequate alternative forum may not be met. Ibid.
*939 In the present case, plaintiffs claim the existence of those "rare circumstances." Their argument is based on several factors, one of which being the lack of recognition, in the U.K., of plaintiffs' causes of action except those premised upon products liability resulting from design defect or failure to warn and upon wrongful death and survivorship or, alternatively, the substantial limitations imposed on those causes of action in the U.K.
Plaintiffs' expert concedes that the English Consumer Protection Act of 1987(CPA), which establishes strict products liability rules for U.K. plaintiffs, is closely analogous to the products liability laws recognized in New Jersey. See N.J.S.A. 2A:58C-1 to -11. Causes of action arising upon a death that is alleged to be causally related to ingestion of VIOXX are similarly recognized. However, the U.K. plaintiffs claim that there is no U.K. analog to the Consumer Fraud Act; there may be no basis, abroad, for their breach of express warranty claims; and a claim for loss of consortium is not recognized.
We reject plaintiffs' argument, premising our determination on the closely analogous facts of Piper Aircraft and the United States Supreme Court's legal reasoning in that case. In Piper Aircraft, the personal representative of the estates of Scottish citizens killed in the crash of a small plane in Scotland, filed suit against the plane and propeller manufacturers in the United States. The representative, a California resident who was a legal secretary to the attorney instituting suit, admitted that the action was filed in this country "because its laws regarding liability, capacity to sue, and damages are more favorable to her position than are those of Scotland." 454 U.S. at 240, 102 S.Ct. at 258, 70 L.Ed.2d at 426. On appeal from a decision of the Third Circuit Court of Appeals holding that the District Court had incorrectly applied the doctrine of forum non conveniens to dismiss the plaintiffs' action, the Supreme Court reversed, holding that plaintiffs could not defeat the defendants' forum motion merely by showing that the substantive law that would be applied, were suit to be instituted in Scotland, was less favorable than that available in the United States  a circumstances the Court termed an "unfavorable change in law." The Court held that this occurrence "should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry." 454 U.S. at 247, 102 S.Ct. at 261, 70 L.Ed.2d at 430. The Court based this holding on an earlier decision in Canada Malting Co. v. Paterson Steamships, Ltd., 285 U.S. 413, 419-20, 52 S.Ct. 413, 414, 76 L.Ed. 837, 841 (1932). The Court found it immaterial that Canada Malting had been decided before the doctrine of forum non conveniens had been decisively articulated in Gilbert:
It is true that Canada Malting was decided before Gilbert. . . . However, Gilbert in no way affects the validity of Canada Malting. Indeed, by holding that the central focus of the forum non conveniens inquiry is convenience, Gilbert implicitly recognized that dismissal may not be barred solely because of the possibility of an unfavorable change in the law. Under Gilbert, dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice. If substantial weight were given to the possibility of an unfavorable change in law, however, dismissal might be barred even where trial in the chosen forum was plainly inconvenient.

*940 [Piper Aircraft, supra, 454 U.S. at 248, 102 S.Ct. at 262, 70 L.Ed.2d at 431 (footnotes omitted).]
The Court further observed that "if conclusive or substantial weight were given to the possibility of a change in law, the forum non conveniens doctrine would become virtually useless" and "[d]ismissal would be appropriate only if the court concluded that the law applied by the alternative forum is as favorable to the plaintiff as that of the chosen forum." Id. at 250-51, 102 S.Ct. at 263, 70 L.Ed.2d at 432-33. However, the Court found the doctrine was designed in part to avoid the necessity of "complex exercises in comparative law." Id. at 251, 102 S.Ct. at 263, 70 L.Ed.2d at 432-33.
Upholding the decision of the Court of Appeals would result in other practical problems. At least where the foreign plaintiff named an American manufacturer as defendant, a court could not dismiss the case on grounds of forum non conveniens where dismissal might lead to an unfavorable change in law. The American courts, which are already extremely attractive to foreign plaintiffs, would become even more attractive. The flow of litigation into the United States would increase and further congest already crowded courts.
[Id at 251-52, 102 S.Ct. at 263-64, 70 L.Ed.2d at 433 (footnotes omitted).]
In Piper Aircraft, the Court acknowledged that Scottish law did not recognize strict liability in tort. Further, wrongful death actions were permitted only when brought by a decedent's relatives, and those relatives could sue only for "loss of support and society," and thus, monetary recoveries were less. However, those factors were not considered sufficiently significant to render Scotland a clearly inadequate forum. The Court held: "Although the relatives of the decedents may not be able to rely on a strict liability theory, and although their potential damages award may be smaller, there is no danger that they will be deprived of any remedy or treated unfairly." Id. at 255, 102 S.Ct. at 265, 70 L.Ed.2d at 435.
Similarly, in the present case, if litigation were to occur in the U.K., plaintiffs could still assert their strict liability causes of action, which are presently recognized in England and Wales and which constitute the mainstay of plaintiffs' legal theories of liability, as well as those causes of action arising from the death of persons taking VIOXX, and possibly, a negligence cause of action. Although relief under New Jersey's statutory Consumer Fraud Act, N.J.S.A. 56:8-1 to -20, would not be available, as well as other likely subsidiary causes of action, the unavailability of a specific cause of action in a foreign jurisdiction does not preclude forum non conveniens dismissal. As long as some cause of action is still available to plaintiffs, the unavailability of a specific claim in the alternate forum cannot be said to render that forum inadequate. See Kamel v. Hill-Rom Co., 108 F.3d 799, 803 (7th Cir. 1997) (availability of, at a minimum, breach of contract action sufficient to render Saudi Arabia an adequate forum); Lockman Foundation v. Evangelical Alliance Mission, 930 F.2d 764, 768-69 (9th Cir.1991) (RICO and Lanham Act claims not available in Japan, but tort and contract claims could permit recovery); Kempe v. Ocean Drilling & Exploration Co., 876 F.2d 1138, 1145 (5th Cir.), cert. denied, 493 U.S. 918, 110 S.Ct. 279, 107 L.Ed.2d 259 (1989) (RICO claim not available in Bermuda, but fraud and negligence claims allowed).
Although New Jersey recognizes that a loss of consortium claim is derivative only insofar as it is dependent upon spousal injury, and that the damages awarded are different from those available *941 to the person suffering direct injury, Kibble v. Weeks Dredging & Const. Co., 161 N.J. 178, 190-91, 735 A.2d 1142 (1999), we are aware of no precedent holding that jurisdiction must be maintained in an inconvenient forum simply because loss of consortium claims would not be recognized by the alternative court. Rather, in such circumstances, dismissal has been found to be warranted. See Massaquoi v. Virgin Atlantic Airways, 945 F.Supp. 58, 61 (S.D.N.Y.1996) (lack of recognition of a claim for loss of consortium does not render England an inadequate alternative forum). We deem it unreasonable to accord dispositive weight in a forum non conveniens analysis to such a derivative cause of action, regardless of the loss of a damages remedy. Such tail-wagging cannot overcome the well-established principles governing forum determination in this context.
We similarly reject plaintiffs' claim that the lack of punitive damages makes the U.K. an inadequate forum for their litigation. As we have already noted, Piper Aircraft establishes that a reduction in a potential damage award that does not deprive plaintiff of a remedy is insufficient to render a proposed alternative forum inadequate. 454 U.S. at 255, 102 S.Ct. at 265, 70 L.Ed.2d at 435. Even where the award would be drastically reduced in an alternate forum, courts have failed to find the proposed forum inadequate on these grounds. Lockman, supra, 930 F.2d at 768-69 (absence of treble damages due to inapplicability of RICO claim in foreign jurisdiction does not render forum inadequate); Transunion Corp. v. PepsiCo Inc., 811 F.2d 127, 129 (2d Cir.1987) (same); Irish Nat'l Ins. Co. v. Aer Lingus Teoranta, 739 F.2d 90, 91 (2d Cir.1984) (cap on damages of $260 when value of damaged goods was $125,000 was insufficient to render Ireland an inadequate forum); Danser v. Firestone Tire & Rubber Co., 86 F.R.D. 120, 122 (S.D.N.Y.1980) (lack of punitive damages in Netherlands and West Germany was not sufficient to render forum inadequate). Indeed, it has been held that the absence of punitive damages "does not come close to establishing inadequacy." Hull 753 Corp. v. Elbe Flugzeugwerke GmbH, 58 F.Supp.2d 925, 929 (N.D.Ill. 1999).[1]
Plaintiffs' further arguments that different or less generous discovery would be available in the U.K., and that they would be unable to obtain trial by jury, have been rejected elsewhere. See Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1352-53 (1st Cir.1992) (finding Turkish discovery procedures sufficient, even if unlike those afforded under the federal rules), cert. denied, 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993); Lockman, supra, 930 F.2d at 768 (Japanese discovery procedures, although not identical to those of the United States, found to be adequate); Zipfel v. Halliburton Co., 832 F.2d 1477, 1484 (9th Cir.1987)(limitation on depositions by Singapore's courts did not render forum inadequate), cert. denied sub nom, Crowley Maritime Corp. v. Zipfel, 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, 809 F.2d 195, 205 (2d Cir.1987)(limited discovery under *942 India's laws was insufficient as a reason to maintain suit in the United States). See also Lockman, supra, 930 F.2d at 768 (rejecting argument based on unavailability of jury trials); Union Carbide, supra, 809 F.2d at 199 (same); Danser, supra, 86 F.R.D. at 122 (same, discussing potential actions in Netherlands and West Germany).
Our determination that the U.K. provides an adequate alternative forum for this litigation in terms of substantive and procedural law and damages accords with the conclusion of plaintiffs' own U.K. counsel, a consortium of three firms including the London law firm of Leigh Day and Co., an experienced English plaintiffs' product liability firm. In a certification provided on behalf of the plaintiffs by solicitor Martyn Day, a partner of that firm, Day stated:
On 24th August 2005 [the Leigh Day and Co.] website ran an article headed `Vioxx cases: UK v. U.S. as a forum for UK claimants?' In that article we set out the pros and cons with taking the case in either jurisdiction and came to the view it was better to bring the claims in the UK.
What apparently changed the minds of plaintiffs' U.K. counsel was the cost of litigation and the inability, to date, to obtain public funding for the litigation as a sole source of funds or in combination with fee deferral agreements backed by insurance.
Having invested significant resources into the pursuit of the claim there is no way that ourselves [the Leigh Day and Co. firm], alongside Messrs Irwin Mitchell, and Goodmans, would have abandoned the claims in the UK if we had felt there was any realistic route to having them funded.
However, plaintiffs do not suggest that mass-plaintiff pharmaceutical litigation in the U.K. has, as a rule, been found to be cost-prohibitive. Moreover, public funding for a "group action" suit of the type that counsel envisions has not been wholly precluded, and may be sought again in 2007.[2] As Day has certified: "Historically the vast majority of group actions have gone ahead with the benefit of public funding."[3] Additionally, although contingent fee agreements are not permitted, lawyers may work on a "no win, no fee basis" under what are known as conditional fee agreements (CFAs). Pursuant to such CFAs, the lawyers are reimbursed only if they prevail, and then their fees are assessed on the basis of counsel's hourly rates, plus an additional percentage, up to a maximum of 100%. "After-the-event" (ATE) insurance may be utilized to protect attorneys from litigation costs, as well as to protect plaintiffs charged with the costs of Merck, if imposed upon them under the U.K.'s "loser pays" system, although only £1 million in coverage out of the £5 million minimum, estimated as needed, presently appears to be available. The potential for trying test cases exists in the U.K., as it does here, as a mechanism for decreasing cost and risk. The existence of substantial discovery already conducted in *943 connection with the United States' cases should also serve to reduce litigation costs.
Additionally, there is now some discretion as to the imposition of the "winner's" costs upon the loser.[4] Part 44 of the English Civil Procedure Rules of 1998(CPR) has, to an extent, modified the English "loser pays" system. CPR r. 1.1 sets out criteria to be utilized by the court in assessing costs, and mandates that the financial positions of the parties are a relevant consideration. Thus, success on the merits no longer guarantees full cost reimbursement. Moreover, we observe that counsel's concern that the litigation not bankrupt the plaintiffs, while laudable, suggests an apparent lack of confidence in the ultimate merits of at least some of their claims.
Our review of the facts as certified by plaintiffs' experts, including Day, satisfy us that the financial challenges of bringing mass tort litigation in the U.K. are not so insurmountable as to render that forum either inadequate or unavailable. The fact remains that citizens of the U.K. regularly utilize their courts to obtain justice, even in cases of this sort. That counsel must undertake a financial risk in instituting mass pharmaceutical products liability litigation is undoubtedly true. However, that risk exists wherever the litigation is commenced. Its magnitude depends in large measure upon the merits of the plaintiffs' claims  a matter that experienced counsel is well-positioned to evaluate, particularly in light of the discovery and trials that have already taken place in the United States. Further, we note that counsel's arguments center around the present unavailability of "up-front" money. We have been offered nothing of substance to suggest that, if plaintiffs prevail, counsel will be unable to recoup its fees and costs through recoveries from Merck or the plaintiffs themselves and insurance. Thus, if the plaintiffs' claims have merit, we do not perceive that they will encounter any fatal difficulty in obtaining adequate representation in the U.K., as they have in the United States. See, e.g., In re Factor VIII or IX Concentrate Blood Products Liability Litigation (Gullone v. Bayer Corp.), 408 F.Supp.2d 569, 581-82 (N.D.Ill.2006), aff'd, 484 F.3d 951 (7th Cir.2007). The risk of not prevailing is a risk of litigation that is not a proper consideration of a forum non conveniens analysis.
We are further satisfied that, as the result of the discretion given to courts of the U.K. in the imposition of costs on the loser, as we have described it, the "English System" of cost recovery does not render the U.K. an inadequate forum for forum non conveniens purposes.[5]Id. at 582 (recognizing that discretion exists in the U.K.'s loser pays system, and observing that "[c]onsidering the unfortunate circumstances of the plaintiffs in this case," hemophiliacs, suffering from HIV allegedly caused by tainted blood, "we have difficulty *944 imagining any court exercising its discretion to order these plaintiffs to pay the attorneys' fees of the defendants.").
In sum, we have difficulty accepting the position of a group of residents of the U.K. that perceived inadequacies in the tort and damages laws and the rules for funding and cost allocation of their countries of residence entitle them to seek justice in New Jersey where the law and fee arrangements are more favorable. By this argument, plaintiffs essentially contend that the U.K. provides an inadequate forum for the resolution of the disputes of the English and Welsh living within its borders. We do not regard the claimed inadequacies of one country's system of funding suits and allocating costs as a ticket to relief elsewhere, but rather, as a subject for legislative or court reform, should such be warranted.

IV.
Having determined that the U.K. constitutes an adequate alternative forum for plaintiff's litigation, we turn to the second step in a forum non conveniens analysis, consisting of an evaluation of the private and public factors bearing upon the suitability of plaintiffs' choice of forum.[6]
In Gilbert, the Supreme Court identified "private interest" factors as relevant to a forum non conveniens analysis, enumerated in D'Agostino as follows:
(1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses, (3) whether a view of the premises is appropriate to the action and (4) all other practical problems that make trial of a case "easy, expeditious and inexpensive," including the enforceability of the ultimate judgment.
[D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 263, 542 A.2d 44 (App.Div.1988) (citing Gilbert, supra, 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062), aff'd, 115 N.J. 491, 559 A.2d 420 (1989)].
Following an analysis of those private factors that are relevant to this litigation, consisting primarily of the first two, Judge Higbee found the parties' positions to be in equipoise. In fact, evidence relating both to the claims of individual plaintiffs that their injuries were the result of taking VIOXX and to damages is all located in the U.K. Merck has stipulated, for purposes of its motion only, that "the sale and marketing of VIOXX was directed from New Jersey."[7] Thus, evidence is geographically *945 divided, in accordance with the issue to be proven. However, we note that the majority of the proofs with respect to liability to be offered by plaintiffs will come from Merck  a party to the litigation, not third parties, whereas the evidence needed by Merck to contest issues of causation and damages will come from independent sources. It is thus likely that the ability of the U.K. plaintiffs to procure the attendance of Merck's employees at trial in the U.K. and the production of its documents there probably exceeds the ability of Merck to procure independent witnesses and documents relating to plaintiffs' conditions and damages in New Jersey, since compulsory process will be unnecessary with respect to the former, but the cumbersome procedures of the Hague Convention may be required with respect to the latter. See Lehman v. Humphrey Cayman, Ltd., 713 F.2d 339, 342-43 (8th Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984) (observing that compulsory process would not be necessary to secure the attendance of the employees of the defendant hotel, but finding that the geographical location of witnesses should not be dispositive of a forum non conveniens analysis).
On appeal, plaintiffs note Judge Higbee's comment that "it was most likely a combination of decisions made in the U.S. and in foreign countries that governed the sale and marketing of VIOXX." They claim this factual supposition, which is contrary to Merck's stipulation for purposes of the motion, undercuts the judge's determination that the private-interest factors were in balance. However, our independent review of the record satisfies us that the judge's comment, likely resulting from a recognition that VIOXX underwent regulatory approval in the U.K. and was labeled in accordance with U.K. standards, does not significantly detract from her conclusion that Merck's forum motion cannot be decided on the basis of private-interest factors. It is undisputed that, to prevail, Merck must show that the chosen forum is demonstrably inappropriate. We agree with Judge Higbee that an evaluation of the private-interest factors that are relevant in this case does not appreciably aid in satisfying Merck's burden.

V.
We likewise agree with Judge Higbee's implicit conclusion that it is the public-interest factors that are decisive in this case. D'Agostino listed those factors as:
(1) the administrative difficulties which follow from having litigation "pile up in congested centers" rather than being handled at its origin, (2) the imposition of jury duty on members of a community having no relation to the litigation, (3) the local interest in the subject matter such that affected members of the community may wish to view the trial and (4) the local interest "in having localized controversies decided at home."
[D'Agostino, supra, 225 N.J.Super. at 263, 542 A.2d 44 (quoting Gilbert, supra, 330 U.S. at 508-09, 67 S.Ct. at 843, 91 L.Ed. at 1062-63).]
We find two considerations of particular significance in analyzing these public-interest factors. First of all, as we have previously noted, the VIOXX prescribed to the U.K. plaintiffs in this case underwent a lengthy pre-market approval process in the U.K., involving testing and evaluation of data independent from that occurring in the United States, and the warnings accompanying *946 the product were based upon U.K. requirements, which differ from those in the United States.[8]
Although we do not find it necessary or advisable to decide choice-of-law issues in the context of this forum non conveniens motion, we can safely assume that U.K. law will apply at least to issues relating to such product approval and labeling.[9]See Doe v. Hyland Therapeutics Div., 807 F.Supp. 1117, 1129 (S.D.N.Y.1992) (forum where drug is sold has "a distinctive interest in explicating the controlling standards of behavior, and in enforcing its regulatory scheme"). As the court stated in Harrison v. Wyeth Lab. Div. of Amer. Home Prods. Corp.:
Both the British and the American governments have established requirements as to the standards of safety for drugs and the adequacy of any warnings to be given in connection with its use. Each government must weigh the merits of permitting the drug's use and the necessity of requiring a warning. Each makes its own determination as to the standards of degree of safety and duty of care. This balancing of the overall benefits to be derived from a product's use with the risk of harm associated with that use is peculiarly suited to a forum of the country in which the product is to be used.
[510 F.Supp. 1, 4 (E.D.Pa.1980), aff'd, 676 F.2d 685 (3d Cir.1982).]
If the litigation proceeds in New Jersey, it is unlikely that a New Jersey jury would have any interest in or relationship to plaintiffs' causes of action, insofar as they are based upon regulatory activities and law applicable in the U.K. and not here. While we have no doubt that a New Jersey jury would be capable of applying foreign law, to the extent that it is applicable to plaintiffs' claims, we question why it should be called upon to do so in these cases.
Further, New Jersey's interest in having the controversy decided here is lessened by the residence of the plaintiffs abroad and their ingestion, in the U.K., of a prescription drug subject to foreign regulation. To be sure, New Jersey maintains an interest in regulating the conduct of corporations domiciled here. Gantes v. Kason Corp., 145 N.J. 478, 489, 679 A.2d 106 (1996). However, as Judge Higbee has noted, that interest can be well satisfied through litigation of the fifteen thousand suits instituted against Merck by residents of the United States.
Whether the U.K. plaintiffs remain in this court or not, the New Jersey court system will have plenty of opportunity to deter Defendant from future unsavory conduct if Defendant is found to be liable regarding the allegations against it. The number of foreign plaintiffs that would be dismissed will not affect this.
*947 In these circumstances, the U.K.'s interest, as expressed by Judge Higbee, in "addressing the injuries of its citizens and adjudicating matters regarding products regulated and marketed within its borders" becomes of paramount concern. Mastondrea v. Occidental Hotels Management, S.A., 391 N.J.Super. 261, 282, 918 A.2d 27 (App.Div.2007); Madan-Russo v. Grupo Posada, S.A. de C.V., 366 N.J.Super. 420, 427-28, 841 A.2d 489 (App.Div.), certif. denied, 180 N.J. 448, 852 A.2d 187 (2004); see also Hyland, supra, 807 F.Supp. at 1128-30; Harrison, supra, 510 F.Supp. at 4-5.
The second consideration of note in this matter arises from Gilbert's recognition of "the administrative difficulties which follow from having litigation pile up in congested centers" as a public-interest factor relevant to a forum non conveniens analysis. 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062; see also Piper Aircraft, supra, 454 U.S. at 252, 102 S.Ct. at 264, 70 L.Ed.2d at 433 (noting the attractiveness of American courts to foreign plaintiffs and forecasting the increase in litigation arising from improper denial of forum non conveniens motions).[10] Judge Higbee, who possesses extensive knowledge gained from the management of this and other mass-tort litigation has observed:
In fact, by its very nature, lawsuits like this that involve a mix of important witnesses from within and outside of the U.S. will be much more difficult to manage than an action involving two states in the United States.
. . . While handing an enormous volume of cases is difficult, it is manageable where all parties are residents of the same country. It is much less costly and much easier to handle the litigation where only different states are involved. In fact, there have been no substantial difficulties in the coordinated litigation in New Jersey up to now based on the fact plaintiffs are from different states. That would not be true if the New Jersey court had to address issues raised because plaintiffs are from the U.K. and from numerous other foreign countries, each of which would present a substantial burden on the court and exacerbate the administrative process the court is already overseeing. . . . The burden on the State of New Jersey courts is an unnecessary one since a foreign country's courts can do a better job of interpreting their laws and protecting their citizens.
We defer to Judge Higbee's conclusion.
Based upon the record before her, Judge Higbee's determination to dismiss plaintiffs' action on forum non conveniens grounds in favor of a U.K. forum, as a principal result of the judge's evaluation of Gilbert's public-interest factors, was well within her equitable discretion to reach, as was her allied determination that Merck had met its burden of establishing that New Jersey constitutes a "demonstrably inappropriate" forum for plaintiffs' litigation. Kurzke, supra, 164 N.J. at 171-72, 752 A.2d 708; Civic Southern Factors, supra, 65 N.J. at 333, 322 A.2d 436.

VI.
As a final matter, we address plaintiffs position, premised upon Kurzke, that discovery should have taken place before Merck's motion was heard. In Kurzke, a case arising from a car accident in Germany, the Supreme Court held that *948 defendant's motion to dismiss plaintiff's action on the ground of forum non conveniens was premature, because there had been no substantive discovery and the manufacturer had not yet made a good faith effort to obtain the discovery in Germany that it claimed would be unavailable if trial were to occur in the United States. 164 N.J. at 168, 752 A.2d 708. See also D'Agostino v. Johnson & Johnson, Inc., 115 N.J. 491, 494 n. 1, 559 A.2d 420 (1989) (observing that the court's ability to properly decide a forum non conveniens motion would be enhanced if "decision were reserved until discovery has proceeded sufficiently to enable the court to make a better-informed assessment of the private- and public-interest factors."). However, here, the difficulties of obtaining discovery did not form a basis for Judge Higbee's decision, which was primarily based on her evaluation of the strength of public-interest factors that will not be altered by discovery. In this circumstance, we see no need for further proceedings in this jurisdiction. Mastondrea, supra, 391 N.J.Super. at 281, 918 A.2d 27.
Affirmed.
NOTES
[1] As support for their position, plaintiffs rely on our decision in Almog v. Israel Travel Advisory Svc., Inc., 298 N.J.Super. 145, 158, 689 A.2d 158 (App.Div.1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297, cert. denied sub nom, Ziemke v. Almog, 525 U.S. 817, 119 S.Ct. 55, 142 L.Ed.2d 42 (1998). However, our reference to the absence of punitive damages under the law of Israel provided a basis only for our choice-of-law analysis and our determination that this country's law applied to plaintiff's far different cause of action for defamation. The absence of punitive damages did not figure in our review of the trial court's forum non conveniens decision.
[2] Full funding has been rejected by the Legal Services Commission, the entity overseeing public funding. However, mixed funding remains potentially available.
[3] To obtain public funding, individual plaintiffs may be required to meet income requirements, unless the income requirement is waived and the matter is recognized as a group action, in which case, full funding may be provided for "generic issues"  estimated at 80% of the work. Plaintiffs must also establish that their cause of action has good prospects for success, and damages are likely to exceed the costs of litigation in a proportion that depends upon the public interest in the litigation.
[4] Because fee-shifting serves to leave intact the recovery of a plaintiff litigating in a forum adopting that system, at least one court has viewed the system as a potential benefit, not a burden. Nai-Chao v. Boeing Co., 555 F.Supp. 9, 16 (N.D.Cal.1982), aff'd sub nom, Cheng v. Boeing, 708 F.2d 1406 (9th Cir.1983), cert. denied, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983).
[5] We do not find plaintiffs' reliance on Altmann v. Republic of Austria, 142 F.Supp.2d 1187, 1209-10 (C.D.Cal.2001), aff'd, 317 F.3d 954 (9th Cir.2002), aff'd, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004), in this regard to be well founded. The reference to fee shifting in that jurisdiction was essentially incidental to a forum non conveniens determination premised upon the operation of Austria's strict statute of limitations to bar plaintiff's claims and the fact that the Austrian court's filing fees were approximately equivalent to the plaintiff's liquid assets.
[6] Although the doctrine of forum non conveniens arose from a perceived need to protect a defendant from harassment, Starr v. Berry, 25 N.J. 573, 587, 138 A.2d 44 (1958), we discern no such motivation here and dismiss that consideration as an alternative basis for affirming the trial court's decision. Sinochem International, supra, ___ U.S. at ___, 127 S.Ct. at 1190, 167 L.Ed.2d at 24 (permitting dismissal, alternatively, when "trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience."). The precedent that we have cited establishes that a finding of harassing or vexatious intent provides an alternative ground for dismissal, but is not required in order for a court to dismiss an action on forum non conveniens grounds. See also D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 261-63, 542 A.2d 44 (App.Div.1988), aff'd, 115 N.J. 491, 559 A.2d 420 (1989).
[7] One court has found, in a tainted blood transfusion case, that the balance of private-interest factors weighed in favor of dismissal where the plaintiff's medical evidence was located in a foreign jurisdiction, but evidence of the defendant's conduct in manufacturing and marketing a defective product was located in the United States. See Doe v. Hyland Therapeutics Div., 807 F.Supp. 1117, 1124-26 (S.D.N.Y.1992). Other courts have reached the same conclusion. See de Melo v. Lederle Lab., Div. of Amer. Cyanamid Corp., 801 F.2d 1058, 1062-63 (8th Cir.1986); Harrison v. Wyeth Lab. Div. of Amer. Home Prods. Corp., 510 F.Supp. 1, 8 (E.D.Pa.1980), aff'd, 676 F.2d 685 (3d Cir.1982).
[8] We decline to address plaintiffs' newly-raised and factually unsupported argument that Merck engaged in the manipulation of foreign regulatory practices. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). In any event, we find the case upon which plaintiffs rely in this context, Carlenstolpe v. Merck & Co., Inc., 638 F.Supp. 901 (S.D.N.Y.1986), appeal dismissed, 819 F.2d 33 (2d Cir.1987), to be wholly inapplicable because it involved a circumstance in which the Swedish government relied wholly upon Merck's representations and the U.S. FDA's approval in granting Merck a license to sell its vaccine in Sweden. Here, the regulatory process differs substantially. Of course, plaintiffs are free to offer evidence of such manipulation at trial, if such exists.
[9] We reject as precedent Rowe v. Hoffmann-La Roche Inc., 383 N.J.Super. 442, 892 A.2d 694 (App.Div.2006), noting that its choice-of-law holding was reversed subsequent to submission of briefing in this case, 189 N.J. 615, 917 A.2d 767 (2007).
[10] Plaintiffs claim the absence of forum shopping. Given Day's acknowledgment of the reasons for instituting suit in the United States, we question the foundation for plaintiffs' assertion. Nonetheless, we find the presence or absence of forum shopping to be essentially irrelevant to our decision in this case.